E X H I B I T

#15

COURT OF APPEAL, FOURTH APPELLATE DISTRICT
DIVISION ONE
Dated 5/17/06

SUPERIOR COURT, IMPERIAL COUNTY
COURT ORDER, Dated 9/22/06

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 977(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 977(b).  This opinion has not been certified for publication or ordered published for purposes of rule 977.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

FILED
Stephen M. Kelly, Clerk
MAY 1 7 2006
Court of Appeal Fourth District

| | |
|---|---|
| In re ALEJANDRO ALVE on Habeas Corpus. | D046857<br>(Super. Ct. No. EHC00581) |

APPEAL from an order of the Superior Court of Imperial County, Raymond A. Cota, Judge.  Affirmed in part; reversed in part.

The record in this case discloses that petitioner was dismissed from a disciplinary hearing at which he was charged with disobeying a lawful order.  Petitioner was dismissed from the hearing after he argued that the hearing officer, against whom he had recently filed an emergency appeal, was biased against him.  Following petitioner's dismissal from the hearing, the hearing was conducted in petitioner's absence and adverse findings were made against him.

There is nothing in the record which justified petitioner's dismissal from the disciplinary hearing.  Moreover, the record supports the conclusion that the hearing

officer did not qualify as a disinterested decisionmaker. Thus we affirm the trial court's order requiring that respondent warden set aside the adverse findings.

However, in addition to ordering that the findings be set aside, the trial court ordered that petitioner's record be expunged of any reference to the violation and that all rights and privileges which petitioner lost as a result of the rules violation be restored. As to this aspect of the trial court's order, we reverse. Because the face of the record does not relieve petitioner from culpability for the alleged rules violation, the trial court should have remanded the matter to the warden with directions that an unbiased hearing officer conduct a disciplinary hearing at which petitioner is present and permitted to question witnesses under the supervision of the hearing officer.

## SUMMARY

The petitioner in this habeas corpus proceeding, Alejandro Alve, is a prisoner at Calipatria State Prison (Calipatria).[1] Initially, he filed an administrative complaint in which he challenged procedures used in conducting strip searches of prisoners returning from work assignments at the Prison Industries Authority (PIA). According to Alve, immediately following his administrative complaint, he was subjected to retaliatory threats from prison guards who had conducted the strip searches. In particular, on the day petitioner filed his administrative complaint, a guard filed a rules violation report

---

[1]    Alve is serving an indeterminate life term for two first degree murders, escape from custody and possession of weapons by a prisoner.

which alleged petitioner refused to enter the strip search area and encouraged other

inmates to also refuse to enter the area.

In response to the threats of retaliation, Alve complained to correctional

Lieutenant Nelson. Lieutenant Nelson told petitioner that if he did not like the searches,

Alve should get another job. According to Alve, Lieutenant Nelson then told guards at

his building to keep Alve in his cell and to not let him have recreation time. Alve then

filed an emergency administrative appeal in which he sought protection from retaliation.

The emergency appeal set forth Alve's complaint to Lieutenant Nelson, the lieutenant's

response and the lieutenant's order keeping Alve in his cell. Alve alleged that Lieutenant

Nelson's conduct was part of the effort to retaliate against him for filing the initial

administrative complaint.

A disciplinary hearing on the rules violation was conducted 11 days after Alve

filed his emergency appeal. The hearing was conducted by Lieutenant Nelson who was

the subject of the emergency appeal. Alve objected to appearing before Lieutenant

Nelson in light of the allegations Alve had made against him. Lieutenant Nelson

responded to petitioner's objection by dismissing Alve from the disciplinary hearing and

conducting the hearing in Alve's absence. Following the hearing, Lieutenant Nelson

sustained the disciplinary allegations and imposed sanctions on Alve. Alve filed an

administrative appeal and on appeal a deputy warden upheld the disciplinary findings and

sanctions.

Alve filed a petition for a writ of habeas corpus in which he alleged that his

constitutional and statutory rights had been violated. The trial court issued an order to

show cause to the warden at Calipatria. Although the warden was given one extension of time, the warden failed to file a timely return. The trial court found Alve's petition and exhibits established a prima facie case for relief and in light of the warden's failure to file a return, granted Alve's petition. (See *In re Serrano* (1995) 10 Cal.4th 447, 455-456.) The trial court ordered that Lieutenant Nelson's officer's findings be set aside. In addition, the trial court ordered that any record of the findings be expunged and that any rights or privileges Alve lost be restored.

The warden filed a timely notice of appeal.

## DISCUSSION

### I

Prison disciplinary proceedings are governed by Penal Code[2] section 2932. Section 2932, subdivision (c)(4), states that at any prison disciplinary proceeding "[t]he prisoner has the right, under the direction of the person conducting the hearing, to question all witnesses." In addition to the rights conferred by section 2932, prisoners facing disciplinary proceedings retain basic due process rights. "Although a prisoner's rights are diminished, the prisoner is not wholly stripped of constitutional protections when imprisoned for crime. [Citation.] Prisoners retain rights under the due process clause, including the right to be heard by an impartial disciplinary committee. [Citation.] However, prison disciplinary proceedings are not part of a criminal prosecution, and the

---

2    All further statutory references are to the Penal Code unless otherwise specified.

full panoply of rights due a defendant in such proceedings does not apply. [Citation.]".

(*People v. Superior Court (Hamilton)* (1991) 230 Cal.App.3d 1592, 1595 (*Hamilton*).)

Here, the deputy warden's decision upholding the disciplinary findings and sanctions contains the following statement: "You requested witnesses at the time of the hearing. This request was granted by the SHO[Senior Hearing Officer].

"The SHO notes that you refused to cooperate within the parameters of the hearing procedures by attempting to litigate a 602 [emergency appeal]. *The SHO therefore dismissed you and continued the hearing in absentia.*" (Italics added.)

In light of this statement there can be no dispute that Alve was involuntarily removed from the hearing and prevented from exercising his rights under section 2932, subdivision (c)(4). We can certainly accept the notion that in some circumstances an inmate's behavior may be so disruptive that the inmate has effectively waived his right to be present and examine witnesses. Here, however, nothing in the record or in the arguments presented by the warden on appeal suggests the objection Alve made to Lieutenant Nelson's role as the hearing officer prevented Alve from nonetheless participating at the hearing and asking questions with respect to the allegation that he disobeyed an order. In light of this violation of Alve's rights under section 2932, subdivision (c)(4), as well as fundamental precepts of due process, Alve was entitled to relief from the trial court. (See *Hamilton, supra*, 230 Cal.App.3d at p. 1595.)

II

The record here also supports Alve's contention he was entitled to relief on the grounds Lieutenant Nelson was not an impartial decisionmaker.

The court in *Hamilton* set forth the authorities which protect an inmate's right to impartial disciplinary tribunals. "Penal Code section 2932, subdivision (c)(1)(A) requires that a prison disciplinary hearing 'be conducted by an individual who shall be independent of the case . . . .' The Department of Corrections has promulgated California Code of Regulations, title 15, section 3320, subdivision (g) to promote this requirement. That regulation provides: [¶] 'Employees who reported the rule violation, or who supplied supplemental reports to the rule violation report, or who observed the alleged violation, or investigated the alleged misbehavior or assisted the inmate in preparing for the hearing, or for any other reason have a predetermined belief that the inmate is guilty or innocent will not sit as a fact finder in a disciplinary hearing nor be present while the fact finders are conducting deliberations to decide guilt or innocence and the appropriate disposition if the inmate is found guilty.' " (*Hamilton, supra,* 230 Cal.App.3d at p. 1595.) In addition to these statutory and regulatory requirements, due process prevents prison staff who have " ' "*participated or will participate in the case as an investigating or reviewing officer,* or either is a witness or has personal knowledge of material facts related to the involvement of the accused inmate in the specific alleged infraction (or is otherwise personally interested in the outcome of the disciplinary proceeding)" ' " from acting as disciplinary hearing officers. (*Id.* at p. 1596.)

In *Hamilton* the prisoner was initially charged by a correctional officer with battery on the officer. A correctional lieutenant then reviewed the charge as required by applicable regulations and changed the charge to "physical assault on staff" and classified the charge as a "Serious -- Division 'B' " rule violation. The same lieutenant then

presided over the prisoner's disciplinary hearing and found the prisoner guilty of the assault charge.  The court found that the lieutenant's role in reviewing the charge prevented her from participating as a hearing officer.  "This review put [the lieutenant] in a prosecutorial role, i.e., a decisionmaking role in connection with the charging.  Also, by making corrections to the rules violation report, [the lieutenant] became involved in reporting the rule violation.  Such an active role in preparing the rules violation report must be characterized *as a substantial involvement in the circumstances underlying the charge*."  (*Hamilton, supra,* 230 Cal.App.3d at p. 1597, italics added.)

Here, the record shows that Lieutenant Nelson had a similar involvement in circumstances underlying the charges against Alve.  In support of his petition, Alve attached the emergency appeal he filed following his conversation with Lieutenant Nelson about the retaliation he was experiencing.  In his emergency appeal, Alve stated that, after he complained to Lieutenant Nelson about the retaliation, Lieutenant Nelson told him:  " 'If you don't want to strip, quit your job and get another one.' "  According to Alve, he then asked Lieutenant Nelson if he had read the initial appeal he had filed and Lieutenant Nelson responded:  " 'I did not read it, and I don't need to.  I was a Work-Change Officer before.  I know the rules. . . .  You're not crossing to work.  You're dangerous.' "  Then, according to Alve, later the same morning, Lieutenant Nelson "phoned the Building Staff and told them to keep me in the cell and not to let me go out to the yard during Yard-Time Recreation Time."

At the disciplinary hearing, Alve attempted to assert retaliation as a defense.  According to the report Lieutenant Nelson prepared, before Alve was removed from the

disciplinary proceeding, he made the following statement: "The [rules violation report] was issued as a Retaliation due to a group appeal submitted regarding the manner in which the body inspections were conducted by staff at B work change area. As a consequence of having petioned (sic) staff conduct the body inspections with the door closed, Retaliation followed"

In sum, the record here discloses Alve had previously accused Lieutenant Nelson of participating in the retaliation he was asserting as a defense to the misconduct charge. Although the trial court did not have to accept in its entirety Alve's characterization of Nelson's motives, given Lieutenant Nelson's alleged participation in the retaliation Alve claimed he suffered and Alve's retaliation defense, Lieutenant Nelson was not an appropriate hearing officer. (See *Hamilton, supra*, 230 Cal.App.3d at p. 1597.)

### III

Although the record supports the trial court's determination Alve was entitled to relief from the findings and sanctions imposed by the warden, it does not support the relief the trial court granted. Neither Alve's removal from the hearing nor Lieutenant Nelson's role as hearing officer absolved Alve of culpability for the underlying offense. As the warden points out, where, as here, the trial court has found a violation of a prisoner's procedural rights, the appropriate remedy is to order a rehearing. (See *In re Rosenkrantz* (2002) 29 Cal.4th 616, 658; *Raditch v. United States* (9th Cir. 1991) 929 F.2d 478, 482; *Bridge v. United States Parole Commission* (3rd Cir. 1992) 981 F.2d 97, 105.) Until the warden has had an opportunity to conduct a new hearing, that portion of

the trial court's order which orders the warden expunge any record of the disciplinary

findings be expunged and that any rights or privileges Alve lost be restored is premature.

## DISPOSITION

The trial court's order granting a writ is affirmed insofar as it directs the warden to

set aside the department's adverse disciplinary finding; however, the order is reversed

insofar as it directs that petitioner's records be expunged and sentence credits and

privileges be restored and the trial court is directed to enter a new order remanding the

matter to the warden for a new disciplinary hearing before an unbiased hearing officer at

which petitioner is to be afforded the opportunity to appear and, under the direction of the

person conducting the hearing, question all witnesses.

BENKE, Acting P. J.

WE CONCUR:

HUFFMAN, J.

McINTYRE, J.

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 977(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 977(b). This opinion has not been certified for publication or ordered published for purposes of rule 977.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA



FILED

Stephen M. Kelly, Clerk

MAY 1 7 2006

Court of Appeal Fourth District

| | |
|---|---|
| In re ALEJANDRO ALVE on Habeas Corpus. | D046858<br>(Super. Ct. No. EHC00572) |

APPEAL from an order of the Superior Court of Imperial County, Raymond A. Cota, Judge. Affirmed in part; reversed in part.

This is an appeal from an order granting a prisoner's petition for a writ of habeas corpus. It is related to the circumstances set forth in another appeal, *In re Alve* (D046857) (*Alve I*). In *Alve I* we affirmed the trial court's finding petitioner Alejandro Alve had been denied his procedural rights in a prison disciplinary hearing. However, we reversed in part because instead of permitting the warden where Alve is incarcerated to conduct a new hearing, the trial court ordered that any record of the discipline be expunged and that all of Alve's rights be restored.

Alve filed an administrative appeal of the disciplinary finding. He argued his reassignment to kitchen work was unlawful and retaliatory. The appeal was returned to Alve by the prison's appeals coordinator because Alve attached to his appeal a statement which exceeded one page, front and back, and because his appeal did not separate his challenge to the work reassignment from his challenge to the discipline imposed. Alve responded to the appeals coordinator's comments by refiling his appeal and attaching a statement in support of the appeal which was on one page, front and back, and which set forth the same arguments Alve made in his initial appeal. On the face of the second appeal, Alve also included a statement in which he argued in fairly harsh terms that the one-page limit did not apply to his appeal.

Alve's second appeal was returned to him by the appeals coordinator on the grounds that it constituted an abuse of the appeals process. Alve responded to the appeals coordinator by advising her that he had in fact complied with the one-page limit. Once again the appeals coordinator advised Alve that his attachment was too long. Once again Alve pointed out that he had reduced his appeal to one page. In response, the appeals coordinator advised Alve that his appeal was "screened out" because it failed to "meet time constraints."

Alve filed a petition for writ of habeas corpus in the trial court in which he named the warden of the prison as respondent and alleged that the appeals coordinator violated his rights in failing to process his administrative appeal and that she did so in order "to cover-up staff's malfeasance." Alve alleged that in failing to process his administrative appeal, the appeals coordinator interfered with his constitutional right to seek redress in

the trial court was not required to accept those allegations as true; it could, if it did not

accept Alve's factual allegations, order further proceedings.  (See *In re Serrano, supra,* 10

Cal.4th at pp. 447-448.)

II

Alve's right to appeal from the decision to assign him to kitchen duty as well as the

disciplinary findings is set forth in California Code of Regulations, title 15, section

3084.1, subdivision (a):  "Any inmate or parolee under the department's jurisdiction may

appeal any departmental decision, action, condition, or policy which they can

demonstrate as having an adverse effect upon their welfare.  The decisions of the

Departmental Review Board which serve as the director's level decision, are not

appealable and conclude the inmate's or parolee's departmental administrative remedy

pursuant to section 3376.1."  (See also § 2932, subd. (a).)

Our review of the record demonstrates that in fact Alve complied with the

principal defect the appeals coordinator identified, the requirement that he attach no more

than one page to his appeal.  The appeals coordinator's repeated rejection of the appeal is

difficult to understand, unless she was objecting to the fact that in resubmitting his appeal

Alve attached it to a new appeals form.  In any event, given the limited record presented

in the trial court, the trial court could have reasonably concluded that the appeals

coordinator did not properly process Alve's administrative appeal, either because Alve

met the procedural requirements or because the appeals coordinator failed to properly

advise Alve about the nature of the defects in his resubmittals.

5

*re Serrano, supra*, 10 Cal.4th at pp. 447-448.) Thus the trial court's decision to instead simply afford Alve his administrative appeal rights in no manner prejudiced the warden.

Because the record is clear the trial court did not reach the merits of Alve's contention that the work transfer was retaliatory, the trial court could not have reached Alve's closely related argument that he had the right to disobey the order that he perform kitchen work. Until Alve has established the relatiatory or unlawful nature of the transfer, he has no grounds upon which to attack the disciplinary finding.[2] Thus there are no valid grounds upon which the trial could have set aside the prison's disciplinary findings and sanctions.

In sum then the trial court could, in the exercise of its discretion, order that Alve be given his right to an administrative appeal. However, having done so, it could make no further final disposition of his rights.

The trial court's order granting a writ is affirmed insofar as it directs the warden to provide Alve with an administrative appeal from the work transfer; however, the trial court's order is reversed insofar as it directs that the disciplinary findings be set aside, petitioner's records be expunged and sanctions be vacated. On remand, and following the

---

2    We do not necessarily accept the notion that any defect in the work transfer would provide justification for disobeying the order to work in the kitchen. The parties have not briefed this issue in this court and we need not reach it on this appeal

ENDORSED

SEP 2 2 2006

SUPERIOR COURT
IMPERIAL COUNTY
JOSE O. GUILLEN, CLERK
BY LYDIA LA AREVALS

1

2

3

SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF IMPERIAL

In Re:                                    Case No.: EHC00581

      ALEJANDRO ALVE,                     ORDER

Petitioner,

on Habeas Corpus.

      Pursuant to the Fourth Appellate District Ruling, the Court's
previous order directing the California Department of Corrections to
expunge petitioner's records and sentence credits and privileges be
restored, is hereby rescinded and set aside.  This Court remands this
matter back to the warden and orders a new disciplinary hearing
before an unbiased hearing officer at which petitioner is to be
afforded the opportunity to appear, and under the direction of the
person conducting the hearing, to question all witnesses.

DATED: _____9/21/06_____    _____
                            RAYMOND A. COTA
                            Judge of the Superior Court

ORDER

E  X  H  I  B  I  T

#16

CDC-115, Log# 07-03-B81R  (Case No. D046857)

STATE OF CALIFORNIA                                                                                    DEPARTMENT OF CORRECTIONS

804 TO RECORDS: 10/17/06

# RULES VIOLATION REPORT

| CDC NUMBER | INMATE'S NAME | | RELEASE/BOARD DATE | INST. | HOUSING NO. | LOG NO. |
|---|---|---|---|---|---|---|
| B-77176 | ALVE | (X) (w) | Life | CAL-IV | B2-239L | 07-03-B81R |

| VIOLATED RULE NO(S). | SPECIFIC ACTS | LOCATION | DATE | TIME |
|---|---|---|---|---|
| CCR-3005(b) | REFUSING TO OBEY ORDERS | B WORKCHANGE | 07/24/03 | 1345 HOURS |

CIRCUMSTANCES  On Wednesday, October 11, 2006, CDC-115, Log # 07-03-B81, per Modification Order was ordered reissued and reheard by G.J.Janda (CDO), base upon Modification Order (#CAL-B-03-01525), and retyped on October 11, 2006.

On Thursday, July 24, 2003, at approximately 1345 hours, while performing my duties as B Work-Change C/O #1.  Inmate ALVE, B-77176, B2-239L, intensely and willfully delayed the Workchange release process by refusing to enter the Work-change Strip-Area.  ALVE also tried to encourage other inmates to do the same.  ALVE was ordered to enter the Work-Change area several times by myself and the Voc, Patrol Officers.  Inmate ALVE is not a participant of the Mental Health Service Delivery System (M.H.S.D.S.) care.  Inmate ALVE is aware of this report.

| REPORTING EMPLOYEE (Typed Name and Signature) | DATE | ASSIGNMENT | RDO'S |
|---|---|---|---|
| ▶ E.E. DEAN, CORRECTIONAL OFFICER | 10/11/06 | B WORKCHANGE C/O | S/S/H |

| REVIEWING SUPERVISOR'S SIGNATURE | DATE | ☐ INMATE SEGREGATED PENDING HEARING | | |
|---|---|---|---|---|
| ▶ R.G. SUTTON, SERGEANT | 10/1/06 | DATE N/A | LOC. | N/A |

| CLASSIFIED | OFFENSE DIVISION: | DATE | CLASSIFIED BY (Typed Name and Signature) | HEARING REFERRED TO |
|---|---|---|---|---|
| ☐ ADMINISTRATIVE  XX SERIOUS | 0-30    F | 10/11/06 | ▶ M. WHITMAN, CC II | ☐ HO  ☒ SHO  ☐ SC  ☐ FC |

## COPIES GIVEN INMATE BEFORE HEARING

| ☒ CDC 115 | BY: (STAFF'S SIGNATURE) | DATE | TIME | TITLE OF SUPPLEMENT |
|---|---|---|---|---|
| CDC-115A | ▶ | 10/11/06 | 1955 | N/A |

| ☐ INCIDENT REPORT LOG NUMBER: | BY: (STAFF'S SIGNATURE) | DATE | TIME | BY: (STAFF'S SIGNATURE) | DATE | TIME |
|---|---|---|---|---|---|---|
| N/A | ▶ | | | ▶ | | |

HEARING  On Wednesday, November 01, 2006, at approximately 1420 hours, Inmate ALVE, B-77176, appeared before me for adjudication of this Rules Violation Report (RVR), charging him with violation of the California Code of Regulations (CCR), Section 3005(b), specifically for "REFUSING TO OBEY ORDERS."  I introduced myself as the Senior Hearing Officer (SHO) for this disciplinary hearing and explained the hearing rules and procedures to ALVE.  ALVE stated that he was in good health.  ALVE stated that he understood the disciplinary process and the specific charge.  ALVE is not a participant in the Mental Health Services Delivery System, nor is he a participant in either the Disability Placement or Developmental Disability Program.

DUE PROCESS:  Inmate ALVE verified that he received all pertinent documents more than twenty-four (24) hours prior to the hearing.  The preliminary copy of this RVR was served to ALVE within fifteen (15) days of discovery and the hearing was held within thirty (30) days of service.  Time constraints have been met.  There are no Due Process violations.

INVESTIGATIVE EMPLOYEE:  Per CCR, Section 3315(d)(1), Correctional Officer K. Teeters was assigned as an Investigative on (11/11/06), as the Investigative Employee (I.E.) in this matter.

(CONTINUED ON NEXT PAGE)

| REFERRED TO  ☐ CLASSIFICATION  ☐ BPT/NAEA | | |
|---|---|---|

| ACTION BY: (TYPED NAME) | SIGNATURE | DATE | TIME |
|---|---|---|---|
| M. McNAIR, CORRECTIONAL LIEUTENANT  (SHO) | ▶ | 11-1-06 | 1516 |

| REVIEWED BY: (SIGNATURE) | DATE | CHIEF DISCIPLINARY OFFICER'S SIGNATURE | DATE |
|---|---|---|---|
| ▶ W.J. PRICE, FACILITY F CAPTAIN | 10/1/06 | ▶ G.J. JANDA, ASSOCIATE WARDEN, (CDO) | 11/6/06 |

| ☒ COPY OF CDC 115 GIVEN INMATE AFTER HEARING | BY: (STAFF'S SIGNATURE) | DATE | TIME |
|---|---|---|---|
| | ▶ | 11/6/06 | 2000 |

CDC 115 (7/88)

# SERIOUS RULES VIOLATION REPORT

| CDC NUMBER | INMATE'S NAME | VIOLATED RULE NO(S). | DATE | INSTITUTION | LOG NO. |
|---|---|---|---|---|---|
| B-77176 | ALVE    (BLK) | CCR-3005(b) | 07/24/03 | CSP-CAL-IV | 07-03-B81R |

REFERRAL FOR FELONY PROSECUTION IS LIKELY IN THIS INCIDENT ☐ YES ☒ NO

## POSTPONEMENT OF DISCIPLINARY HEARING

| | INMATE'S SIGNATURE | DATE |
|---|---|---|
| ☐ I DO NOT REQUEST my hearing be postponed pending outcome of referral for prosecution. | ► N/A | |
| ☐ I REQUEST my hearing be postponed pending outcome of referral for prosecution. | ► | |

| DATE NOTICE OF OUTCOME RECEIVED | DISPOSITION |
|---|---|
| | |

| | INMATE'S SIGNATURE | DATE |
|---|---|---|
| ☐ I REVOKE my request for postponement. | ► | |

## STAFF ASSISTANT

| STAFF ASSISTANT | INMATE'S SIGNATURE | DATE |
|---|---|---|
| ☐ REQUESTED   ☐ WAIVED BY INMATE | ► | |

| ☐ ASSIGNED | DATE | NAME OF STAFF |
|---|---|---|
| ☐ NOT ASSIGNED | REASON | |

D A/M C  3315 (d)(2)(A)

## INVESTIGATIVE EMPLOYEE

| INVESTIGATIVE EMPLOYEE | INMATE'S SIGNATURE | DATE |
|---|---|---|
| ☒ REQUESTED   ☐ WAIVED BY INMATE | ►X (signature) | 10/11/06 |

| ☐ ASSIGNED | DATE | NAME OF STAFF |
|---|---|---|
| ☐ NOT ASSIGNED | REASON | |

EVIDENCE / INFORMATION REQUESTED BY INMATE:

## WITNESSES

WITNESSES REQUESTED AT HEARING (IF NOT PRESENT, EXPLAIN IN FINDINGS)

☒ REPORTING EMPLOYEE   ☐ STAFF ASSISTANT   ☐ INVESTIGATIVE EMPLOYEE   ☐ OTHER _____   ☐ NONE

| WITNESSES (GIVE NAME AND TITLE OR CDC NUMBER) | GRANTED | NOT GRANTED | WITNESSES (GIVE NAME AND TITLE OR CDC NUMBER) | GRANTED | NOT GRANTED |
|---|---|---|---|---|---|
| YOUNT E51128 B5 | ☐ | ☐ | | ☐ | ☐ |
| Dean C/O | ☐ | ☐ | | ☐ | ☐ |

INVESTIGATIVE REPORT: Investigative Employees must interview the inmate charged, the reporting employee, and any others who have significant information, documenting the testimony of each person interviewed. Review of files, procedures, and other documents may also be necessary.

On Wednesday, October 11, 2005, I introduced myself to Inmate ALVE, B-77176, as having been assigned as his Investgative Employee (I.E.), per California Code of Regulations (CCR), Section 3315(d)(A)(1)(2). Inmate ALVE expressed no objections and aknowledged receipt of all reports and documents pertaining to this case. Witnesses were requested as indicated by his signature on the CDC-115A.

INMATE'S STATEMENT:  Inmate ALVE offered no statement at this time.

WITNESS STATEMENT:  The following question was asked of Inmate PIMENTAL, E-81084, but was deemed irrelevant by an SHO as it did not pertain to the charged offense, the question is as follows:

Q1):  Isn't it a fact that for signing a group appeal that you received a 115 and your family was threatened by C/O R.R. Limon?

WITNESS STATEMENT:  The following two (2) questions were asked of Inmate BARION, T-06711, by ALVE, but was deemed irrelevant by an SHO as it did not pertain to the charged offense, they are as follows:

Q1):  Wasn't it a fact that you were issued several 115 for not going to work as a reprisal for signing the group appeal?

| | INVESTIGATOR'S SIGNATURE | DATE |
|---|---|---|
| Issued copy of 115 on 10/11/06 @ 1955 hrs C/O K Teeters | ► K. TEETERS, CORRECTIONAL OFFICER | 10/23/06 |

| ☒ COPY OF CDC 115-A GIVEN INMATE | BY: (STAFF'S SIGNATURE) | TIME | DATE |
|---|---|---|---|
| Final copy 11/17/06 @ 2000 C/O KTeeters | | 1930 | 10/23/06 |

CDC 115-A (7/88)

— If additional space is required use supplemental pages —

OSP 03 74845

STATE OF CALIFORNIA

RULES VIOLATION REPORT - PART C

DEPARTMENT OF CORRECTIONS

PAGE _1_ OF _2_

| CDC NUMBER | INMATE'S NAME | LOG NUMBER | INSTITUTION | TODAY'S DATE |
|---|---|---|---|---|
| B-77176 | ALVE    (BLK) | 07-03-B81R | CAL-CSP-IV | 11/01/06 |

☐ SUPPLEMENTAL  ☒ CONTINUATION OF:  ☐ 115 CIRCUMSTANCES  ☒ HEARING  ☐ IE REPORT  ☐ OTHER_____

**STAFF ASSISTANT:** Per CCR 3315(d)(2), a staff assistant was not assigned because: 1)Inmate ALVE is literate, 2) Inmate ALVE speaks fluent English and 3) the complexity of the issues are such that assistance is not necessary for Inmate ALVE to comprehend the nature of the charges or the disciplinary process. Additionally, Inmate ALVE does not need assistance that would require a confidential relationship, as described in CCR 3318(b)(2)(A).

**INMATE PLEA:** The charges were read to Inmate ALVE and he pled **NOT GUILTY.**

**INMATE STATEMENT:** "Inmate ALVE stated, " The 115 was written in reprisal for a group appeal I filed."

**OTHER:** Inmate ALVE requested the reporting employee be present at the hearing, However the reporting employee was not available.

**WITNESSES:** Inmate ALVE requested Two (2) witnesses to be present at his hearing. Correctional Officer Dean, and Inmate YOUNT, E-51128, B5-208L.

**FINDINGS:** Inmate ALVE was found **NOTGUILTY** of CCR # 3005 (b), for the specific act of "**REFUSING TO OBEY ORDERS."** This findings was based upon a preponderance of evidence submitted at the hearing, which is considered invalid and does not substantiate the charge.

**DISPOSITION:** Officer Dean is currently out on Workers Compensation, several attempts were made to contact Officer Dean, via the Telephone and were unsuccessful. Inmate ALVE requested Officer Dean (the Reporting Employee), be present at this hearing. Due to Officer Dean not being avaiable Inmate ALVE's Constitutional Rights would then be violated. Based on this information, this CDC-115 is being DISMISSED, as continuing with this hearing would be a violation of Inmate ALVE's Constitutional Rights.

This CDC-115 was DISMISSED. This decision was based upon; Inmate ALVE was advised of his rights to appeal the findings and/or Disposition of this hearing, pursuant to CCR 30841.1, Right to Appeal, and also advised that he would receive a completed copy of this RVR, upon final audit by the Chief Disciplinary Officer (CDO). The review and signature of the CDO affirms, reverses, or modifies the disciplinary action and/or credit forfeiture and constitutes the First Level of review for appeal purposes.

| SIGNATURE OF WRITER | DATE SIGNED |
|---|---|
| M. McNAIR, Correctional Lieutenant ( SHO) | 11.1.06 |

| | GIVEN BY (Staff's Signature) | DATE SIGNED | TIME SIGNED |
|---|---|---|---|
| ☒ COPY OF CDC 115-C GIVEN TO INMATE | | 11/7/06 | 2000 |

CDC 115-C REVISED (3/98)

STATE OF CALIFORNIA                                                    DEPARTMENT OF CORRECTIONS

RULES VIOLATION REPORT - PART C                              PAGE __2__ OF __2__

| CDC NUMBER | INMATE'S NAME | LOG NUMBER | INSTITUTION | TODAY'S DATE |
|---|---|---|---|---|
| B-77176 | ALVE (W) | 07-03-B81R | CAL-CSP-IV | 10/11/06 |

☐ SUPPLEMENTAL   ☒ CONTINUATION OF: ☐ 115 CIRCUMSTANCES ☐ HEARING ☒ IE REPORT ☐ OTHER____

**Q2):** Were you stopped from going to work the day after you signed a group appeal?

**WITNESS STATEMENT:** The following four (4) questions were asked of Instructor Cosio of Eyewear by ALVE. The first, third, and fourth question was deemed irrelevant by an SHO as they did not pertain to the charged offense. The second question was allowed and they are both as follows:

~~**Q1):**~~ Were you aware of inmates signing a group appeal, and what did it Intel?

**Q2):** When you left at-between 1420 and 1430 did you see Inmate ALVE still standing on the other side of the line waiting to be searched?

**A2):** Sometimes he was and sometimes he wasn't, but I can not remember if he was or was not on this date.

**Q3):** For how long did you keep ALVE on "S" time and did you contact a higher ranking staff why ALVE was not allowed to attend work and did you get an explanation?

**Q4):** Did you fire ALVE as teachers aide position in Voc Eyewear?

**WITNESS STATEMENT:** The following three questions were asked of Inmate YOUNT, E-51128 by ALVE. The first question was deemed irrelevant by an SHO as it did not pertain to the charged offense. The second and third questions were allowed and they are as follows:

**Q1):** Did you sign a group appeal and what was it about?

**Q2):** Did you witness Officer Dean ordering ALVE to wait behind the line til I was the last man?

**A2):** Yes I do.

**Q3):** Did you hear Dean make any threats towards ALVE?

**A3):** I can't recall exactly, but I do remember there being tension and I can remember arguing about stripping out and the wanted him to wait there.

## (CONTINUED ON NEXT PAGE)

| | SIGNATURE OF WRITER | DATE SIGNED |
|---|---|---|
| | K. TEETERS, CORRECTIONAL OFFICER | 10/23/06 |
| ☒ COPY OF CDC 115-C GIVEN TO INMATE | GIVEN BY (Staff's Signature) | DATE SIGNED 10/23/06 | TIME SIGNED 1930 |

CDC 115-C REVISED (3/98)   Final copy 11/7/06 2000 K Teeters

STATE OF CALIFORNIA

DEPARTMENT OF CORRECTIONS

RULES VIOLATION REPORT - PART C

PAGE __2__ OF __2__

| CDC NUMBER | INMATE'S NAME | LOG NUMBER | INSTITUTION | TODAY'S DATE |
|---|---|---|---|---|
| B-77176 | ALVE  (W) | 07-03-B81R | CAL-CSP-IV | 10/11/06 |

☐ SUPPLEMENTAL    ☒ CONTINUATION OF:    ☐ 115 CIRCUMSTANCES    ☐ HEARING    ☒ IE REPORT    ☐ OTHER____

**WITNESS STATEMENT:** Correctional Officer E. Dean is retired from the California Department of Corrections and Rehabilitation and is unavailable for comment, therefore Officer Dean's written report will serve as his statement for this I.E.

**REPORTING EMPLOYEE'S STATEMENT:** "On Thursday, July 24, 2003, at approximately 1345 hours, while performing my duties as B Work Change Officer #1. Inmate ALVE, B-77176, B2-239L, intensely and willfully delayed the Workchange release process by refusing to enter the Workchange strip area. ALVE also tried to encourage other inmates to do the same. ALVE was ordered to enter the Workchange area several times by myself and the Voc, Patrol Officers."

This concludes this Investigative Employee's report.

| SIGNATURE OF WRITER | DATE SIGNED |
|---|---|
| K. TEETERS, CORRECTIONAL OFFICER | 10/23/06 |

| ☒ COPY OF CDC 115-C GIVEN TO INMATE | GIVEN BY (Staff's Signature) | DATE SIGNED | TIME SIGNED |
|---|---|---|---|
| | | 10/23/06 | 1930 |

CDC 115-C REVISED (3/98)

FINAL COPY 11706  2000 c/o KTeeters

E X H I B I T


#17


Motion for Mandamus Order
Dated:  8/30/07
Case No.  EHC00572  (D046858)

ALEJANDRO ALVE
B-77176    B2-239L
P.O. BOX. 5002
CALIPATRIA, CA., 92233-5002


SUPERIOR COURT OF CALIFORNIA
COUNTY OF IMPERIAL


ALEJANDRO ALVE

       Petitioner,

v.

L.E. SCRIBNER, WARDEN,

       Respondent.

)
)
)
)
)
)
)
)
)
)

Case No.   EHC00572

Court of Appeal No.    D046858


MOTION FOR A MANDAMUS ORDER


    Petitioner approaches the Court to seek a Mandamus Order to compel Respondent's compliance with the Opinion issued by the Court of Appeal, Fourth Appellate District, Division One, on May 17, 2006.

    The request for the Mandamus Order is based on the following:

    On May 17, 2006, the Court of Appeal, Fourth Appellate District, Division One, issued an Order directing the Warden to provide petitioner with an administrative appeal in Case: CDC-115, Log# 11-03-B82, dated November 27, 2003. (See Ex. "A"). However, to date, administration has ignored the Court Order.

    Pursuant to Procedure, upon receiving the Opinion of the Court of Appeal, administration was compelled to immediately comply with the Court Order and provide petitioner with an administrative appeal, but it did not do so, despite petitioner's requests to administration to provide him with the administrative appeal since the Court Order was recieved, in May 17, 2006.

    It was until June 6, 2007, at the Annual Classification Committee, that administration finally acknowledged the Court's Opinion and provided petitioner with

1

authorization to an administrative appeal. Accordingly, on June 10, 2007, petitioner submitted the appeal to the Appeals' Office. (See Appeal, CDC-602, date 6/10/07)

Not having received a response after 53 days, petitioner submitted a CDC-602 demanding a response from administration (Title 15, §3084.6(3)) On August 2, 2007, Appeals' Coordinator sent petitioner a CDC-695 Form therein stating that time limits had experied per CCR 3084.6(c); and advising as follows:

> "...if you would like to pursue this matter further, you must submit an explanation and supporting documentation explaning why you did not or could not file your appeal timely."

(See EX. "E")

Thereupon, petitioner submitted the explanation explaning therein that the explanation had been given in the first paragraph of the appeal. (See EX. "F")

On August 16, 2007, Appeals' Coordinator, yet again, sent petitioner another CDC-695 Form refusing to process petitioner appeal, and consequently, refusing to adhere to the Court of Appeal's Opinion, dated May 17, 2006, to provide the petitioner with an administrative. (See EX. "G")

Despite petitioner's efforts to compel administration to comply with the Opinion of the Court issued on May 17, 2006, administration has been adamant to stop procedure and deprive petitioner of his right to appeal (Title 15, §3084.1(a)); consequently, Appeals Coordinator's rejection of petitioner's appeal constitutes an unlawful barrier to petitioners constitutionally protected right to seek relief at court. (Lewis V Casey (1996) 518 U.S. 343, 349-351; Bounds V Smith (1977) 430 U.S. 817, 821.)

WHEREFORE, petitioner requests the Court to grant his request and issue a Mandamus Order ordering Respondent to comply with the Court of Appeals' Opinion.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:_____8/30/07                    Respectfully submitted,

                                        _Alejandro Alve_
                                        ALEJANDRO ALVE, B-77176  (B2-230L)

2

# <u>VERIFICATION</u>

STATE OF CALIFORNIA
COUNTY OF IMPERIAL

( C.C.P. SEC. 446 & 2015.5; 28 U.S.C. SEC. 1746 )

I, _____ALEJANDRO ALVE_____ DECLARE UNDER THE PENALTY OF PERJURY
THAT : I AM THE ___Petitioner___ IN THE ABOVE ENTITLED ACTION;
I HAVE READ THE FOREGOING DOCUMENTS AND KNOW THE CONTENTS THEREOF AND THE SAME IS
TRUE OF MY OWN KNOWLEDGE, EXCEPT AS TO MATTERS STATED THEREIN UPON INFORMATION, AND
BELIEF, AND AS TO THOSE MATTERS, I BELIEVE THEM TO BE TRUE.

EXECUTED THIS ___8/30/07___ DAY OF _____, 2001, AT CALIPATRIA
STATE PRISON, CALIPATRIA, CALIFORNIA 92233-5002

(SIGNATURE) _____
(DECLARANT/PRISONER)

## <u>*PROOF OF SERVICE BY MAIL*</u>

(C.C.P. SEC. 1013 (a) & 2015.5; 28 U.S.C. SEC. 1746 )

I, _____ALEJANDRO ALVE_____ AM A RESIDENT OF CALIPATRIA STATE PRISON, IN THE COUNTY
OF IMPERIAL, STATE OF CALIFORNIA; I AM OVER THE AGE OF EIGHTEEN (18) YEARS OF AGE AND AM A
NOT A PARTY OF THE ABOVE ENTITLED ACTION. MY STATE PRISON ADDRESS IS: P.O. BOX 5002,
CALIPATRIA, CALIFORNIA 92233-5002.

ON ___8/30/07___, 20__, I SERVED THE FOREGOING:

___MOTION FOR A MANDAMUS ORDER___
(SET FORTH EXACT TITLE OF DOCUMENT IS SERVED)
ON THE PARTY(S) HEREIN BY PLACING A TRUE COPY(S) THEREOF, ENCLOSED IN A SEALED ENVELOPE
(S), WITH POSTAGE THEREON FULLY PAID, IN THE UNITED STATES MAIL, IN A DEPOSIT BOX SO
PROVIDED AT CALIPATRIA STATE PRISON, CALIPATRIA, CALIFORNIA 92233-5002

SUPERIOR CODURT OF CALIFORNIA
COUNTY OF IMPERIAL
939 MAIN STREET
EL CENTRO, CA., 92243

DISTRICT ATTORNEY'S OFFICE
COUNTY OF IMPERIAL
939 MAIN STREET
EL CENTRO, CA., 92243

THERE IS DELIVERY SERVICE BY UNITED STATES MAIL AT THE PLACE SO ADDRESSED, AND THERE IS
REGULAR COMMUNICATION BY MAIL BETWEEN THE PLACE OF MAILING AND THE PLACE SO
ADDRESSED. I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

DATE: ___8/30/07___, 20__, _____
(DECLARANT/PRISONER)

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )
Hearing of: )          CDC Number B-77176
 )
ALEJANDRO ALVE )          **INMATE**
 )
_____)          **COPY**

CALIPATRIA STATE PRISON

CALIPATRIA, CALIFORNIA

NOVEMBER 16, 2005

8:49 A.M.

PANEL PRESENT:

Mr. Thomas Sawyer, Presiding Commissioner
Ms. Carol Bentley, Deputy Commissioner

OTHERS PRESENT:

Mr. Alejandro Alve, Inmate
Mr. Axel Sharrieff, Attorney for Inmate
Mr. Richard Sachs, Deputy District Attorney
(Video)

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____  No          See Review of Hearing
_____  Yes         Transcript Memorandum

**Judy K. Farncomb          Peters Shorthand Reporting**

ii

## INDEX

                                                    PAGE

Proceedings....................................... 1

Case Factors...................................... 5

Pre-Commitment Factors............................ 17

Post-Commitment Factors........................... 31

Parole Plans...................................... 20

Closing Statements................................ 51

Recess............................................ 60

Decision.......................................... 61

Adjournment....................................... 72

Transcriber Certification......................... 73

--oOo--

1

1          P R O C E E D I N G S

2          **DEPUTY COMMISSIONER BENTLEY:**  Okay, we're

3   on record.

4          **PRESIDING COMMISSIONER SAWYER:**  Okay,

5   this is a Subsequent Parole Consideration

6   Hearing for Alejandro Alve, A-L-V-E, did I

7   pronounce that correct?

8          **INMATE ALVE:**  Correct, Alve.

9          **PRESIDING COMMISSIONER SAWYER:**  CDC

10  Number B, as in boy, 77176.  The date is

11  November 16th, the time is 9:49 -- 8:49 in the

12  morning.  We are at Calipatria State Prison.

13  The date received was 10/6/1976, County of San

14  Diego was the commitment county.  The offense

15  was first-degree murder, with use of a firearm,

16  case number CR, Charles Robert, 36086, Count

17  Number One is 187 and 12022.5 of the Penal Code,

18  life plus 1 year and four months.  Minimum

19  eligibility parole date was 11/08/1982.  There's

20  additional offenses here, and one is an escape,

21  4530(d) of the Penal Code and the County of

22  commitment was Marin, case number 10088, and

23  Count Two of possession of a weapon by a

24  prisoner, 2402 of Penal Code, County of Marin,

25  case number 10088.  This Hearing is being tape-

26  recorded.  And for the purpose of voice

27  identification, each one of us is required to

2

 1  state our first and our last names.  When it

 2  comes to your turn, Mr. Alve, you will also give

 3  us, after your spell your last name, your CDC

 4  number, as well.  I'll start, Tom Sawyer,

 5  S-A-W-Y-E-R, Commissioner.

 6      **DEPUTY COMMISSIONER BENTLEY:**  Carol

 7  Bentley, B-E-N-T-L-E-Y, Deputy Commissioner.

 8      **INMATE ALVE:**  Prisoner, Prisoner Alve,

 9  A-L-V-E, B-77176.

10      **ATTORNEY SHARRIEFF:**  Axel Sharrieff,

11  S-H-A-R-R-I-E-F-F, Attorney for Mr. Alve.

12      **PRESIDING COMMISSIONER SAWYER:**

13  Mr. Sachs.

14      **DEPUTY DISTRICT ATTORNEY SACHS:**  Richard

15  Sachs, that's S-A-C-H-S, Deputy District

16  Attorney.

17      **PRESIDING COMMISSIONER SAWYER:**  Thank

18  you.  The record reflects, Mr. Alve, that you

19  have signed BPT Form 1073, which is a Reasonable

20  Accommodations Notice and Request in Accordance

21  with the Previsions of the Americans with

22  Disabilities Act.  This was signed by you on

23  9/16/05, and it indicates on here that you do

24  not need any help for your Parole Hearing, and

25  I'm going to pass this over to your counsel.  If

26  you will look at that and make sure that's

27  correct --

3

1        **INMATE ALVE:**  Uh huh.

2        **PRESIDING COMMISSIONER SAWYER:**  -- and

3    current.

4        **ATTORNEY SHARRIEFF:**  It's current,

5    Commissioner, thank you.

6        **PRESIDING COMMISSIONER SAWYER:**  Thank

7    you.  So, for the record, Mr. Sharrieff handed

8    me a form that indicates that you've discussed

9    the accommodation for disabilities with your

10   client as well as the outline of the Hearing

11   procedure.  And both have signed off on that.

12   Is that correct, sir?

13       **ATTORNEY SHARRIEFF:**  That's correct.

14       **PRESIDING COMMISSIONER SAWYER:**  Ok, do --

15   so you waive the future reading?

16       **ATTORNEY SHARRIEFF:**  So waived.

17       **PRESIDING COMMISSIONER SAWYER:**  Okay,

18   Thank you.  Commissioner Bentley, is there any

19   confidential material that will be used for

20   this?

21       **DEPUTY COMMISSIONER BENTLEY:**  No, we

22   won't be using it.

23       **PRESIDING COMMISSIONER SAWYER:**  Okay,

24   thank you.  I'm going to pass this Hearing

25   Checklist.  Mr. Sachs, if you can do your

26   Hearing Checklist since your teleconferencing.

27       **DEPUTY DISTRICT ATTORNEY SACHS:**  Thank

4

1  you, I have all the documents, Commissioner.

2        **PRESIDING COMMISSIONER SAWYER:**   Thank

3  you.

4        **ATTORNEY SHARRIEFF:**   I do as well, thank

5  you.

6        **PRESIDING COMMISSIONER SAWYER:**   Thank

7  you.  It's marked as Exhibit I.  Mr. Sharrieff,

8  is there any additional documents to be

9  submitted?

10       **ATTORNEY SHARRIEFF:**   No additional

11  documents.

12       **PRESIDING COMMISSIONER SAWYER:**   Are there

13  any preliminary objections?

14       **ATTORNEY SHARRIEFF:**   No objections.

15       **PRESIDING COMMISSIONER SAWYER:**   Okay,

16  will the inmate be speaking with the Panel?

17       **ATTORNEY SHARRIEFF:**   Yes he will, but not

18  regarding the commitment offense.

19       **PRESIDING COMMISSIONER SAWYER:**   Okay,

20  thank you.  Will you raise your right hand,

21  Mr. Alve.  Okay, do you solemnly swear or affirm

22  that the testimony you give at this Hearing will

23  be the truth, the whole truth and nothing but

24  the truth?

25       **INMATE ALVE:**   Yes I do.

26       **PRESIDING COMMISSIONER SAWYER:**   Thank

27  you.  Okay, I'm going to be reading from the

5

1  Board Report, Commitment Factors, this Report is

2  dated November 4, November of '04, and Summary

3  of Crime, on Page 1.  Okay, this is per the

4  Probation Officer's Report, dated 9/2/76, Arrest

5  Report, dated 11/13/75, and 10/21/75, and the

6  San Quentin Incident Report, dated 7/25/1986.

7  Sentencing transcripts and Appellate Court

8  opinions:

9        On 10/3/1975, Police Officers

10       respond to Indian Street, San

11       Diego, California, to a location

12       of the Swing Bar, in regards to a

13       report of a robbery.  Upon

14       arrival, Police Officers found

15       victim, David Stephens, inside the

16       building totally nude, and in an

17       emotional conditions.  Police

18       Officers also found the body of

19       Gary Dores --  I'm going to spell

20       Stephens, S-T-E-P-H-E-N-S, and

21       Dores is spelled D-O-R-E-S --

22       lying on the floor nude with a

23       knife protruding from his abdomen.

24       The autopsy reveled that he had

25       been shot twice in the head,

26       stabbed in the neck and abdomen

27       and his organs had been cut five

6

1        times, genital organs had been cut

2        five times.  Victim Stephens was

3        interviewed and stated that he and

4        Gary Dores, the bartender at the

5        Swing Bar, were leaving after

6        closing up.  Victim Dores opened

7        the rear door of the bar and were

8        met at the door by a male Mexican,

9        later identified as Alejandro

10       Alve, with a handgun demanding

11       money.  Victim Dores complied by

12       removing all the money from his

13       cashbox and the money from the

14       safe room, which contained another

15       lock cashboxes that were used by

16       other bartenders.  Victim Stephens

17       stated that Alve took an amount

18       close to $1,000 from the receipts

19       of the cashboxes.  Alve repeatedly

20       cautioned victim Dores and

21       Stephens not to look at him and

22       pulled his T-shirt up over his

23       head and used it as a mask, after

24       he cut the eyes and mouth holds

25       out of his T-shirt.  Alve had

26       victims Dores and Stephens move

27       towards the cash register at the

7

```
1      bar, and the victim Dores told
2      Alve that there was a little money
3      in the cash register and Alve took
4      it all.  Alve wanted to drink and
5      victim Dores fixed him a Tom
6      Collins and then Alve told him, do
7      you know, I'm going to have to
8      kill both of you.  The victim
9      Dores asked why.  Alve told him,
10     you saw my face and I leave no
11     witnesses, I'm too young to go
12     back to prison.  Victim Stephens
13     stated that Alve ordered another
14     drink and victim Dores fixed him
15     another Tom Collins.  After this,
16     victim Stephens stated that Alve
17     pulled out his penis and told him
18     not to look at him, and then told
19     victim Dores to give him a head-
20     job.  Victim Stephens related that
21     he hid his eyes and did not see
22     the act and that approximately two
23     minutes' time elapsing when a
24     fight ensured between victim Dores
25     and Alve and both were struggling
26     with the gun.  Victim Stephens
27     stated that two shots were fired
```

1     and he dove under the bar

2     immediately.  Victim Stephens

3     stated that Alve called him by his

4     name three times and told him to

5     get up.  When he did, he saw

6     victim Dores on his knees with his

7     right hand up, saying, I'm sorry,

8     I didn't know what came over me, I

9     didn't mean to do that.  Victim

10    Stephens stated that Alve had them

11    walk to the men's room, had them

12    both strip down, told them to take

13    off their clothes, which they did.

14    Alve told them that he was going

15    to have to kill both of them.

16    Victim Stephens stated that he and

17    victim Dores started crying and

18    pleaded with Alve not to kill

19    them.  Victim Stephens stated that

20    Alve then locked them inside the

21    juice storage closet and that once

22    inside the storage closet he heard

23    rumbling sound of a trash can

24    getting banged around in the

25    restroom.  After a short period of

26    time, he heard Dores make a high

27    pitch moan and then heard one

```
1        shot.  Victim Stephens stated that
2        he was released from the storage
3        closet and was ordered to move to
4        various parts of the bar and
5        return to the closet.  Victim
6        Stephens stated that Alve told him
7        that he would be all right and to
8        shut the door to the juice closet,
9        and locked it.  Victim Stephens
10       stated that he thought he heard
11       another shot and then silence for
12       a couple of minutes.  And he
13       stated that he, he stated that the
14       back door -- that he, that he, the
15       back and closed, close [sic] and
16       stayed in the closet for
17       approximately half-hour to
18       45 minutes before he managed to
19       break out of the closet and call
20       the police.  On 11/8/75, victim
21       Stephens attended a live lineup in
22       the San Diego County Jail and
23       identified inmate Alve as the
24       murderer.  On 11/9/75, at
25       approximately 0610 hours, Officers
26       Lawless (indiscernible) and
27       Bushway [phonetic] responded to a
```

10

1        South Hamstead [phonetic] Circle,

2        San Diego, regarding a burglary in

3        progress.  They arrived at that

4        location, they were approaching

5        the front door when they observed

6        Alve starting to exit the front

7        door.  Alve was carrying what

8        appeared to be several shirts on

9        hangers in his right hand.

10       Officer Bushway then drew his

11       service revolver and ordered Alve

12       to stop.  Alve ran back inside the

13       residence and slammed the door

14       shut.  Both Officers began running

15       towards the rear of the house,

16       when they heard the sound of

17       breaking glass.  The Officers then

18       noticed a large pane of glass at

19       the patio wall had been broken

20       out, which borders the rim of a

21       canyon.  The Officers could hear

22       sounds of someone moving through

23       the heavy brush in the canyon.

24       Officers responded to the location

25       and entered the residence in an

26       attempt to contact the victim.  At

27       the top of the stairs, which lead

11

1     to a lower area of the house,

2     Officer Harris observed a pile of

3     clothes and a trail of blood.  The

4     blood continued down the stairway

5     and through the downstairs family

6     room and into a bedroom.  Officer

7     Harris approached the bedroom and

8     saw the body lying in the doorway

9     on its side.  Officer Harris

10    started to check the body for

11    signs of life and determined the

12    victim, J.R. Howard, was dead.

13    Meanwhile, Officer Bender went to

14    the address in the North Hamstead

15    Circle, and while at that address,

16    contacted Mrs. Emma [phonetic]

17    Howard, who was the mother of the

18    deceased.  Mrs. Howard appeared to

19    have been beaten about the face

20    and stated that Alve had beaten

21    her with his fists and threatened

22    her with a butcher knife while he

23    ransacked the residence, checking

24    for items of value.  At

25    approximately 750 hours, Alve was

26    apprehended in the canyon area and

27    Officer Bushway recognized Alve as

12

1      the suspect who he had encountered

2      at the front door.  During the

3      crime scene investigation, it was

4      determined that the victim was

5      stabbed in the chest by Alve, with

6      a butcher knife, as he came up the

7      flight of stairs from the

8      downstairs family room area.

9      There was ransacking throughout

10     the house.  Numerous items of

11     silver, glassware, and statue were

12     determined to be missing.  Which

13     these items were subsequently

14     recovered from Alve's yellow

15     Volkswagen van, which was parked

16     several blocks from the victim's

17     residence.  On 7/25/1986, at

18     approximately 905 hours, San

19     Quentin State Prison, an escape

20     attempt by three general

21     population inmates:  inmate Alve,

22     inmate Chavvez, C-H-A-V-V-E-Z, and

23     inmate Rodriguez,

24     R-O-D-R-I-G-U-E-Z, took place in

25     the area of the perimeter wall

26     between the wall post 10 and 11.

27     All three inmates were assigned to

13

1          Prison Industry workers.

2          Correctional officer Adams and

3          correctional officer Fredericks

4          observed the inmates out-of-bounds

5          near the (indiscernible) perimeter

6          wall and informed staff, via

7          institutional radio, of an on-

8          going escape attempt.  Officer

9          Adams fired a shot from the State

10         issued rife to control the inmates

11         while staff arrived.  Custody

12         staff took into custody inmate

13         Rodriguez, Chavvez, and

14         confiscated manufactured stabbing

15         instruments from each inmate.

16         Inmate Alve still attempted to

17         scale the perimeter wall, as he

18         through a rope devise up towards

19         the rail in an attempt to climb

20         the wall several times.  Officer

21         Fredericks ordered Alve to stop

22         and lay down; inmate Alve did not

23         comply.  Inmate Alve had an inmate

24         manufactured stabbing instrument

25         in his right hand and with both

26         hands drove the weapon into solar

27         plex area.  Officer Adams, under

14

```
 1        the direction of correctional

 2        captain D. Baker, fired one shot

 3        into inmate Alve's left leg to

 4        prevent him from committing

 5        suicide.  Inmate Alve was

 6        transported to San Francisco

 7        General Hospital for further

 8        treatment.

 9  The prisoner's version of this, inmate Alve was

10  interviewed by correctional counselor Nieto,

11  N-I-E-T-O, concerning his version of the crimes; this

12  was on 7/29/04.  In regards to J.R. Howard, it states:

13        Alve admitted to accompanying the

14        victim along with the witness,

15        Lawrence [phonetic] Smith

16        [phonetic], to a residence from a

17        bar in the downtown area shortly

18        after 2:00 O'clock in the morning.

19        Inmate Alve also admitted to

20        accosting Mrs. Howard in the

21        upstairs area of the residence,

22        where when she screamed, inmate

23        Alve admitted that he grabbed a

24        hold of her and then she then fell

25        down on to a sofa and covered her

26        face.  She disappeared into the

27        bathroom and closed the door.  He
```

15

```
1       also admitted that J.R. Howard
2       came running up the stairs, that
3       he had a confrontation with him
4       and pushed him back down the
5       stairs just before Police Officers
6       arrived at the scene. However,
7       inmate Alve denies ever assaulting
8       Mrs. Howard or threatening her
9       with a butcher knife, and never
10      stabbing victim J.R. Howard with a
11      butcher knife. On 9/2/04, in
12      regards to the homicide of Gary
13      Dores, stated that inmate Alve
14      denied that he had any involvement
15      in or knowledge of the murder of
16      Gary Dores; he was in Los Angeles
17      visiting relatives on that date.
18      And in a psychiatric evaluation,
19      dated 4/17/79, it states that
20      inmate Alve denied having ever
21      been at the Swing Bar on the night
22      of the crime and he had been at
23      home the whole evening, packing
24      with his wife for preparation for
25      a trip to Las Vegas. Inmate Alve
26      was afforded an opportunity to
27      review his initial Parole
```

```
 1         Consideration Reports, Subsequent
 2         Parole Consideration Herself,
 3         Arrest Reports, and Probation
 4         Officer's Reports, he stated that
 5         I plead not guilty and it stands
 6         as was pled.
 7  Now the aggravating factors in this case:  the
 8  victims were particularly vulnerable; inmate
 9  Alve had the opportunity to stop but continued
10  with the crimes; the use of weapons; the nature
11  of the crimes exhibited viciousness, cruelty and
12  callousness; the crimes were senseless and
13  served no purpose in completing.  And there are
14  mitigating factors.  In addition, there's
15  another crime, and this one was:  Mr. Alve was
16  sentenced to Federal Bureau of Prisons in Lompoc
17  on 7/9/66, for the controlling offense of bail
18  jumping, transportation of illegal aliens.  It's
19  reported that the inmate was not interviewed in
20  regards to the above Federal crime and the
21  Probation Officer's Report did not provide any
22  additional information as to the above crime.
23  Inmate Alve, on 9/15/67, escaped, walked away
24  from Federal Prison.  And on 6/13/1968, inmate
25  Alve was returned to the Federal Bureau of
26  Prison Lompoc and was charged for escape and was
27  sentenced to three indeterminate sentences, six
```

17

1    years concurrent.  In his version, when

2    interviewed on 7/29/04, concerning this

3    particular crime, he stated that he was arrested

4    in 1975, for transporting illegal aliens and was

5    issued a citation and released on OR.  Inmate

6    Alve stated that he did not appear in Court and

7    a warrant was issued for his arrest.  In 1966,

8    he was arrested and sentenced to one year at

9    Lompoc and was paroled to a halfway house in Los

10   Angeles.  Inmate Alve stated that while in Los

11   Angeles his parole was transferred to San Diego

12   and he was released from parole in 1971.  Inmate

13   Alve state that he never escaped from prison and

14   was never sent back to Lompoc for the escape.

15   Inmate Alve stated that he filed a Court order

16   to have the CII corrected, because of the result

17   of the escape he has been prevented from

18   participating in vocational programs.  His rap

19   sheets indicates no juvenile history.  And he

20   was arrested in 1965 by L.A. Sheriff's Office

21   for theft and was sentenced for 16 days and

22   fined $80.  In 1972, he was arrested by San

23   Diego Sheriff's Department for driving while

24   intoxicated, no driver's license, and was

25   sentenced to 12 months probation and fined.  And

26   that's the extent of his adult convictions and

27   arrests.  And his personal factors, he was born

18

1    in Los Angeles on 4/13/1947, reared in Tijuana,

2    Mexico, until the age of four, subsequently

3    raised in San Ysidro, California.  Inmate Alve

4    was the fourth of six children born to the union

5    of Ignacio Salazar, S-A-L-A-Z-A-R, and Otila?

6        **INMATE ALVE:**  Otila.

7        **PRESIDING COMMISSIONER SAWYER:**  Otila,

8    O-T-I-L-A, Salazar.  Inmate Alve was married to

9    -- how do you pronounce your wife --

10       **INMATE ALVE:**  Enriqueta

11       **PRESIDING COMMISSIONER SAWYER:**

12   Enriqueta, a beautiful name, E-N-R-I-Q-U-E-T-A,

13   Delgado [phonetic], on 5/6/71, subsequently

14   divorced in '77.  He has two children from the

15   union, M-A-G-D-I-E-L, and Tanya, T-A-N-Y-A.

16   Inmate Alve stated the divorce was an agreement

17   between his wife and himself after he was

18   sentenced to death, and it was agreed that there

19   would be no communication with the children for

20   the benefit of the children.  He stated that it

21   would be detrimental for the children if they

22   were to approach his -- detrimental to the

23   children if he were to approach his children at

24   the time based on being incarcerated.  Inmate

25   Alve stated that he has good communications with

26   his immediate family and talks to his cousins,

27   nieces and sisters.  Have you ever talked to

19

1  your children?

2        **INMATE ALVE:**  No.

3        **PRESIDING COMMISSIONER SAWYER:**  No.

4        **INMATE ALVE:**  I cannot.

5        **PRESIDING COMMISSIONER SAWYER:**  Why do

6  you feel it would be detrimental if you

7  approached your children?

8        **INMATE ALVE:**  Well, the simple fact that

9  they would be going to school, his father being

10 in prison, it will be detrimental for them for

11 them to know that their father was in prison.

12 And they probably will feel ashamed.

13       **PRESIDING COMMISSIONER SAWYER:**  Do they

14 know that you're in prison?

15       **INMATE ALVE:**  Ah, no they do not.

16       **PRESIDING COMMISSIONER SAWYER:**  Really?

17       **INMATE ALVE:**  No.  My son should be about

18 31 years old, today.

19       **PRESIDING COMMISSIONER SAWYER:**  oh, did

20 you stay in touch with your wife?

21       **INMATE ALVE:**  No I do not.

22       **PRESIDING COMMISSIONER SAWYER:**  Okay.

23 So, you haven't seen or talked to her in a long

24 time?

25       **INMATE ALVE:**  No.

26       **PRESIDING COMMISSIONER SAWYER:**  Since

27 you've been down?

20

1        **INMATE ALVE:**  That's is correct.

2        **PRESIDING COMMISSIONER SAWYER:**  Okay.

3  Future plans indicate that you plan to parole to

4  the residence of your sister, Cecelia Morian,

5  M-O-R-I-A-N, on Orange Avenue, in Chula Vista,

6  California, San Diego County.  Inmate Alve

7  stated that his family members would also

8  provide assistance to him in terms of finance --

9  financially and supportive when he is in need.

10  Inmate Alve stated that he has three sisters:

11  Rosalinda, whose a lawyer; Cecelia, whose a

12  teacher; and Magda [phonetic], who is a

13  housewife.  All three have businesses and their

14  own property.  And he also stated that he's

15  saved about $1,500 since his incarceration, and

16  it could be used to support himself when he's

17  paroled.  Where's that money?

18        **INMATE ALVE:**  It in a trust account.

19        **PRESIDING COMMISSIONER SAWYER:**  Trust

20  account.

21        **INMATE ALVE:**  Presently it's $1,824

22  dollars and 32 cents.

23        **PRESIDING COMMISSIONER SAWYER:**  And 32

24  cents.

25        **INMATE ALVE:**  Yes.

26        **PRESIDING COMMISSIONER SAWYER:**  Okay.

27  Are you familiar with the form that you refused

21

1   to sign that you wished to have the State

2   provide an attorney to assist you?

3           **INMATE ALVE:**  The present one that they

4   were giving me, yes, because on the line, it

5   states that if I didn't have 15 hundred dollars

6   on the books to sign the line.  And since I did

7   have more than 15 hundred dollars on the books,

8   I did not sign the line.

9           **PRESIDING COMMISSIONER SAWYER:**  Do you

10  realize that you're not entitled to a State

11  attorney?

12          **INMATE ALVE:**  Uh, it well, the way that

13  it's stated on the writing there, it ask the

14  question of whether or not I have 15 hundred

15  dollars.

16          **PRESIDING COMMISSIONER SAWYER:**  Uh huh.

17          **INMATE ALVE:**  And I told my counselor at

18  that time, that I did have the 15 hundred

19  dollars and I couldn't sign that because I would

20  perjuring myself.  So, --

21          **ATTORNEY SHARRIEFF:**  That's correct.

22          **INMATE ALVE:**  Uh huh, so, I did sign that

23  previously on May.  I had less than 15 hundred

24  dollars in the books, and I requested for an

25  attorney.  The Parole Board was postponed until

26  this date.  And, I believe, that's the reason

27  why I was appointed a counselor.  Because it was

22

1    a postponement.

2        **ATTORNEY SHARRIEFF:**  Commissioner, may I

3    ask one question?

4        **PRESIDING COMMISSIONER SAWYER:**  Yes.

5        **ATTORNEY SHARRIEFF:**  Do you have access

6    to this $1,827.32?

7        **INMATE ALVE:**  Yes I do (indiscernible)

8    right now.

9        **ATTORNEY SHARRIEFF:**  Can you do whatever

10   you want with that money right now?

11       **INMATE ALVE:**  Yes.

12       **ATTORNEY SHARRIEFF:**  Okay.  At the time -

13   -

14       **INMATE ALVE:**  But with the approval of my

15   counselor, right?

16       **ATTORNEY SHARRIEFF:**  Okay.  Okay.

17       **INMATE ALVE:**  But it's available right

18   now.

19       **ATTORNEY SHARRIEFF:**  No other questions.

20       **PRESIDING COMMISSIONER SAWYER:**  Well, you

21   didn't commit perjury, because you didn't sign

22   it.

23       **INMATE ALVE:**  That is correct.

24       **PRESIDING COMMISSIONER SAWYER:**  That was

25   smart of you to do that.  But he's not entitled

26   to a State attorney, is he?

27       **INMATE ALVE:**  That's in -- could you,

23

1   could you read that Section completely, where it
2   says first where do you want an attorney to be
3   appointed, and I stated, yes?  And it follows up
4   and it indicates nothing as to whether or not it
5   will be appointed or not if I do have or do not
6   have the money.  It simply states whether I do
7   have the money.
8        **PRESIDING COMMISSIONER SAWYER:**  Well, it
9   says -- this form is BPT Form 1003, Request for
10  an Attorney, "I request the assistance of an
11  attorney of my hearing."  That checked.
12       **INMATE ALVE:**  Uh huh.
13       **PRESIDING COMMISSIONER SAWYER:**  Okay.
14  And then you have options, you can -- there's
15  another box that's not checked that says, "you
16  can retain your own attorney and that attorney
17  is," and there's blanks to fill in the
18  attorney's name.  Number two, it says, "I wish
19  to have to have a State attorney assist me.  I
20  declare under penalty of perjury that I'm
21  indigent, I have less than 15 hundred dollars in
22  cash and/or accounts, and I cannot afford an
23  attorney."  And it reference the Title 15
24  Section 2256c.  And then in the box for -- and
25  that box is checked.  In the box it says,
26  "signature of prisoner."  It says, "Refused to
27  sign."  And then it says after that something,

24

1    oh, "inmate's say already has an attorney

2    assigned."

3            **INMATE ALVE:**  Uh huh.  In May, when the

4    BPT was scheduled for May, and it was postponed

5    because of the failure of the doctor to submit

6    the psychiatric evaluation --

7            **PRESIDING COMMISSIONER SAWYER:**  Right.

8            **INMATE ALVE:**  The case was postponed.

9    And, so, I believed that I had already been

10   assigned an attorney as of May of this year.

11   How it was attorney Coren [phonetic], I believe.

12           **PRESIDING COMMISSIONER SAWYER:**  Uh.

13           **INMATE ALVE:**  And being that it was a

14   postponement and not a new BPT, --

15           **PRESIDING COMMISSIONER SAWYER:**  So, you

16   think you get --

17           **INMATE ALVE:**  (indiscernible).

18           **PRESIDING COMMISSIONER SAWYER:**  So, you

19   think that because you had less than 15 hundred

20   dollars at the time --

21           **INMATE ALVE:**  Ah, yes.

22           **PRESIDING COMMISSIONER SAWYER:**  -- in

23   your account.

24           **INMATE ALVE:**  Yes.  And I explained that

25   to the counselor, that at the time, I had about

26   almost 14 hundred dollars.

27           **PRESIDING COMMISSIONER SAWYER:**  Uh huh.

25

1   And so you think that since you didn't use that

2   attorney at that time that you get a free

3   attorney now?

4        **INMATE ALVE:**  No.  What I'm saying is,

5   that at the time when the attorney was

6   appointed, I had less than 15 hundred dollars.

7   And I explained to my counselor that fact, and I

8   indicated that as time would go on I would be

9   getting more assistance from family, more money.

10        **PRESIDING COMMISSIONER SAWYER:**  Uh huh.

11   Okay, and the date -- there's no date on this

12   because -- there is a place for a date but

13   there's not date on this.  The only date that --

14   external date, it says sent inmate copy on

15   9/9/05.

16        **INMATE ALVE:**  Uh huh.

17        **PRESIDING COMMISSIONER SAWYER:**  So, you

18   received this several months ago.

19        **INMATE ALVE:**  Uh, that one -- the last

20   one or the one from May.

21        **PRESIDING COMMISSIONER SAWYER:**  The one

22   I'm talking about here.

23        **INMATE ALVE:**  Uh --

24        **PRESIDING COMMISSIONER SAWYER:**  The

25   refused to sign on.

26        **INMATE ALVE:**  Oh, that's been like three

27   months ago, I think.

26

1        PRESIDING COMMISSIONER SAWYER:  9/9/05,

2  is when you were sent a copy of this form.

3        INMATE ALVE:  Yeah, there was going to be

4  --

5        PRESIDING COMMISSIONER SAWYER:  And it

6  was also in your packet, if you received a

7  packet as well.  Okay, we'll have to deal with

8  this, I guess, differently.

9        DEPUTY COMMISSIONER BENTLEY:  Oh, can I

10  explain something?

11        PRESIDING COMMISSIONER SAWYER:  Yes you

12  can.

13        DEPUTY COMMISSIONER BENTLEY:  Boy, this

14  is some scheme.  On 9/9/05, Mr. Alve was

15  submitted these documents, that's where it says

16  copy sent to inmate.

17        PRESIDING COMMISSIONER SAWYER:  Uh huh.

18        DEPUTY COMMISSIONER BENTLEY:  Then on

19  9/16/05, he signed them and filled them out, and

20  the correctional counselor witnessed.  Do you

21  see that, this is all part of the package.

22        PRESIDING COMMISSIONER SAWYER:  Right.

23        DEPUTY COMMISSIONER BENTLEY:  See, and

24  this was sent 9/9/05.  So, this was all done

25  9/16/05.

26        PRESIDING COMMISSIONER SAWYER:  Okay.

27        DEPUTY COMMISSIONER BENTLEY:  Okay.

27

1          **PRESIDING COMMISSIONER SAWYER:**    Thank
2    you.
3          **DEPUTY COMMISSIONER BENTLEY:**    Uh huh.
4          **PRESIDING COMMISSIONER SAWYER:**    So, when
5    did you go over 15 hundred dollars in your
6    account?
7          **INMATE ALVE:**    As of lately, I think.
8    Where it says that over there.    It's on
9    September, I think, I received $300 and then I
10    received 40 and then I received 200, I believe.
11    And then, of course, the Commissary, that I've
12    been spending money, for Commissary.
13          **PRESIDING COMMISSIONER SAWYER:**    Uh huh.
14          **INMATE ALVE:**    Canteen.
15          **PRESIDING COMMISSIONER SAWYER:**    Where did
16    you receive this money from?
17          **INMATE ALVE:**    Family.
18          **PRESIDING COMMISSIONER SAWYER:**    Family.
19    Where's -- did you have any intent of hiring an
20    attorney?
21          **INMATE ALVE:**    Well, at the time -- I
22    don't know how much an attorney -- it was not,
23    it was not addressed to me, the question whether
24    these money that I had on the books were going -
25    - can be used to pay an attorney or not, or if I
26    was, I was going to be asked to sign papers.
27    Because the whole point of this money, that I

28

1    explained to my counselor, was that this monies

2    was to assist me in the first expenditure upon

3    being released, if and when I'm released on

4    parole, to get transportation to find and look

5    for a job; to do these things.  And I explained

6    to my counselor that at the time between the

7    money that I have saved and the money that I was

8    receiving, I had that amount of money available.

9    And she never suggested that these monies I were

10   to use them to pay for attorney assistance.

11           **PRESIDING COMMISSIONER SAWYER**:  Uh huh.

12   Okay.  I have -- we'll have to deal with that

13   issue.  I have a letter in your file from

14   Mr. Sachs, who has joined us on the

15   teleconference.  I have a letter from the City

16   of San Diego, April 14, 2005, from the Homicide

17   Unit, Kevin Rooney, R-O-O-N-E-Y.  He's reviewed

18   the circumstances.  It talks about the crime.

19   He indicates in here, "one night earlier a 28-

20   year old, John Bemer, B-E-M-E-R, was found dead

21   in Balboa Park, a municipal park, frequented by

22   gays.  Bemer had been shot to death and left in

23   a grassy area.  A .22 caliber weapon was used in

24   both cases."  He says, "Mr. Alve was identified

25   as a suspect and was charged in the deaths of

26   Mr. Dores and Mr. Bemer.  He was convicted of

27   murder and sentenced to death, which was

29

1  adjusted to life without the possibility of

2  parole, for the brutal murders two innocent

3  strangers.  It is the recommendations of the San

4  Diego Police Department that Mr. Alve remain in

5  custody and not be considered for parole."  And

6  that's that letter.  And we have a letter,

7  September 30th, to the Parole Board,

8  September 30, 2004, "my name is Armando

9  [phonetic], I'm 15 years old.  I may not be an

10  adult or 18, but I saw everyone writing a letter

11  to help my uncle and I wanted one, too."  He

12  talks about how he loves you and writes letters

13  back and forth.  And so he's asking us to let

14  you out.  I have a letter from Magda, your

15  daughter, it's not your daughter it's your

16  sister.

17        **INMATE ALVE:**  Sister.

18        **PRESIDING COMMISSIONER SAWYER:**  San

19  Diego.  The family misses you.  "Whatever he

20  needs financially and emotionally, my family

21  will be able to do so."  And asking us to

22  reconsider this case.  A letter from Corina

23  [phonetic] Alliman [phonetic], dated

24  September 8, 2004, and this is your niece, 20

25  years old.  She's going to college, working

26  part-time.  She is supportive of parole and

27  would like us to give you another chance.  I

30

1   have a letter from Cecilia, that's your sister?

2       **INMATE ALVE:**  Yes she is.

3       **PRESIDING COMMISSIONER SAWYER:**  Alliman.

4   This is dated September 3, 2004.  She talks

5   about how close you are, how you communicate

6   with your family.  You'd be welcomed.  And is

7   certainly supportive of parole.  Daniel Alliman,

8   Jr., September 3, 2004, that's your nephew.

9   He's 28-years old.  He talks about the good

10  times you could have as an uncle-nephew

11  relationship.  And he certainly would like you

12  to be paroled.  Now, who was it -- I didn't find

13  anywhere they said that you could come and live

14  with them.

15      **INMATE ALVE:**  Well, my sister says that

16  in any way she can.  If that is a necessary

17  factor upon suitability for parole --

18      **PRESIDING COMMISSIONER SAWYER:**  She says,

19  "Whatever he needs, financially and emotionally,

20  my family and I are able to do so."  Is that a

21  place to live?

22      **INMATE ALVE:**  Uh, yes.

23      **PRESIDING COMMISSIONER SAWYER:**  That's --

24      **INMATE ALVE:**  It is understood --

25      **PRESIDING COMMISSIONER SAWYER:**  Magda --

26      **INMATE ALVE:**  -- to be, with all my

27  sisters.

31

1          **PRESIDING COMMISSIONER SAWYER:**  You feel
2  they're all supportive of you?

3          **INMATE ALVE:**  Yes.  It's my nephews who
4  wrote the letters, they were born after my
5  incarceration.

6          **PRESIDING COMMISSIONER SAWYER:**  Uh huh.

7          **INMATE ALVE:**  And there have been
8  communications and constant, very strong family
9  ties.

10          **PRESIDING COMMISSIONER SAWYER:**  Okay.

11          **INMATE ALVE:**  So, that will be a factor
12  required --

13          **PRESIDING COMMISSIONER SAWYER:**  Yes.

14          **INMATE ALVE:**  -- I'm certain that I can
15  do so.

16          **PRESIDING COMMISSIONER SAWYER:**  Okay,
17  very good.  Commissioner Bentley.

18          **DEPUTY COMMISSIONER BENTLEY:**  Thank you.
19  Good morning.

20          **INMATE ALVE:**  Good morning.

21          **DEPUTY COMMISSIONER BENTLEY:**  Okay.  Your
22  last Board of Prison Terms Hearing was
23  November 6, 2001, where you received a three-
24  year denial.

25          **INMATE ALVE:**  Yes.

26          **DEPUTY COMMISSIONER BENTLEY:**  Okay.  You
27  came in to CDC in October of '76, and then in

32

 1    August of 1993, you came here to Calipatria.

 2             **INMATE ALVE:**  That is correct.

 3             **DEPUTY COMMISSIONER BENTLEY:**  And you

 4    have picked up two 115s since that last Hearing.

 5    I know that your attorney has provided us with a

 6    writ that is apparently on Appeal, but I will

 7    note that the reason the writ was granted was

 8    because the District Attorney had not made a

 9    timely response; it wasn't based on the merits

10    of the 115.  The first one that you received was

11    refusing to obey orders.  What was that about?

12             **INMATE ALVE:**  It has in relation -- it

13    was issued in relation to a -- as a retaliatory

14    means, that's the reason why I was taken to

15    Court.  As it explained there in the paper work,

16    it's a consequence of having written the group

17    appeal form against staff's conduct at the

18    B Yard entrance, I was issued a 115 for

19    disobeying orders, and that's the reason why

20    this 115 was issued.  And why it was challenged

21    at Court, itself, and the Court, as it's stated

22    there, although the attorney, the District

23    Attorney did not submitted the response, the

24    reply, the Court did find that it had prima-

25    facie on the case, reason why it granted it.

26    And it is, the 115, administrative.  I lost no

27    privileges and was given only ten days

33

1   (indiscernible).

2        **DEPUTY COMMISSIONER BENTLEY:**  That's not

3   what it says on this 115.

4        **INMATE ALVE:**  Oh.

5        **DEPUTY COMMISSIONER BENTLEY:**  Let me make

6   sure that it wasn't --

7        **INMATE ALVE:**  Yeah.

8        **DEPUTY COMMISSIONER BENTLEY:**  -- reduced

9   to administrative.

10       **PRESIDING COMMISSIONER SAWYER:**  There's

11  on the -- there's a 128 on 11/24/03, refusing to

12  work.

13       **DEPUTY COMMISSIONER BENTLEY:**  Yeah, no,

14  I'm just -- no, this is something different.

15  Sometimes when they start out in that -- no, you

16  had 30 days forfeiture of credit, consistent

17  with a Division F offense.

18       **INMATE ALVE:**  That, that was --

19       **DEPUTY COMMISSIONER BENTLEY:**  It was not

20  reduced to administrative.  Okay.  And we have

21  to accept what's valid still here in your C-

22  File.  And then, as Mr. Sawyer was indicating,

23  you got the 128A for refusing to report to work.

24  And then a few days later, apparently, you

25  refused to report again and that ended up with

26  you getting a 115.

27       **INMATE ALVE:**  That is correct, but if I

34

1   may explain.

2           DEPUTY COMMISSIONER BENTLEY:  Uh huh.

3           INMATE ALVE:  At that time, I was, as the

4   record shows, I was unassigned, an adverse

5   unassignment from my job position as a teacher's

6   aid.  And under Title 15, 3040(e), it states

7   that teacher's aids are in a specific group work

8   position.  And according to the rules, upon

9   being unassigned from that position, the

10  prisoner is to be assigned in a similar position

11  with possibly the same pay rate once he is

12  unassigned after two year, or if you are

13  unassigned from the position.  As a consequence

14  of my unassignment, I was assigned to kitchen,

15  to wipe tables.  And so I refused to report to

16  work on the basis that to do so would be

17  violating the rules of the Title 15, which

18  specifically stated that I was to be assigned in

19  a position similar --

20          DEPUTY COMMISSIONER BENTLEY:  Okay.

21          INMATE ALVE:  -- to the one I had.  Also,

22  I must also state, that in the year 2000, I was

23  transferred from A Yard to B Yard in order to

24  participate in the Honor Block Program.  And in

25  doing so, I was behind the wall participating in

26  this program when I was unassigned and

27  adversively [phonetic], and it was as a result

35

1   of this retaliation action, as a consequence of

2   submitting this (indiscernible).  So, my not

3   reporting to work was actually as a result of

4   complying with the Rules and Regulations.  For

5   had I reported to work, I would be violating the

6   rule --

7           **DEPUTY COMMISSIONER BENTLEY:**  Okay.

8           **INMATE ALVE:**  -- of Title 15, 3040(e).

9           **DEPUTY COMMISSIONER BENTLEY:**  Mr. Sawyer

10  I don't know about you, but I'm quite impressed

11  with your knowledge of Title 15 and all the

12  Regulations.  And you are obviously a very

13  intelligent, bright person.  On the other hand,

14  you expect us to believe you couldn't understand

15  this form that you had to hire your own

16  attorney.  So, I think it's kind of selective

17  wisdom, when it benefits you.

18          **INMATE ALVE:**  Uh, no, like I stated, the

19  attorney -- the mistake was here that on May, I

20  was assigned an attorney to represent me --

21          **DEPUTY COMMISSIONER BENTLEY:**  I know,

22  we've already heard all that.

23          **INMATE ALVE:**  Right.

24          **DEPUTY COMMISSIONER BENTLEY:**  Mr. Alve,

25  we've already heard all that.  Okay.  And you

26  also received another 128A, in January 4, 2005,

27  and that was that you made a false allegation

36

1   that you didn't receive your quarterly package.

2           **INMATE ALVE:**  That is not.

3           **DEPUTY COMMISSIONER BENTLEY:**  It says:

4   "That on January 2, 2005, while reviewing

5   property cards for second-level appeals

6   (indiscernible), I discovered that inmate Alve

7   had made a false allegation that he had not

8   received his quarterly package within the 15 day

9   calendar period, as required by Departmental

10  Package Procedures.  My fact finding revealed

11  that inmate Alve had received his quarterly

12  package within 15 day calendar period."

13          **INMATE ALVE:**  When was that?

14          **DEPUTY COMMISSIONER BENTLEY:**  January of

15  this year.

16          **INMATE ALVE:**  Did I submit any paperwork?

17  Any appeals or anything?  Because I'm not aware

18  of this fact.

19          **DEPUTY COMMISSIONER BENTLEY:**  This is

20  signed --

21          **INMATE ALVE:**  In fact --

22          **DEPUTY COMMISSIONER BENTLEY:**  -- by

23  Lieutenant Hill.

24          **INMATE ALVE:**  Is that my name, because I

25  don't believe that.

26          **DEPUTY COMMISSIONER BENTLEY:**  Well, if

27  you're Alve, B-77176,

37

1          **INMATE ALVE:**  Yeah, but --

2          **DEPUTY COMMISSIONER BENTLEY:**  -- it's in

3    your file.

4          **INMATE ALVE:**  -- what does it relates to?

5          **DEPUTY COMMISSIONER BENTLEY:**  Did you

6    have an Olsen Review?

7          **INMATE ALVE:**  An Olsen Review?  The first

8    time I did, this time I declined.

9          **DEPUTY COMMISSIONER BENTLEY:**  You did it

10   for the May one?

11         **INMATE ALVE:**  For the May one, right.

12         **DEPUTY COMMISSIONER BENTLEY:**  Okay, well,

13   this is January.

14         **INMATE ALVE:**  Yeah.  Well, I don't recall

15   that I had ever, I had ever submitted a 602

16   alleging that particular argument.

17         **DEPUTY COMMISSIONER BENTLEY:**  Okay.

18   Well, it's here.  I'm not making it up.

19         **INMATE ALVE:**  May I see it?

20         **DEPUTY COMMISSIONER BENTLEY:**  No, that's

21   okay.  You can, you can check with your

22   counselor, and you can see it at another time.

23   I'm not --

24         **INMATE ALVE:**  But --

25         **DEPUTY COMMISSIONER BENTLEY:**  -- I don't

26   make up these things.

27         **INMATE ALVE:**  The only, the only -- well,

38

1  I have no idea of --

2      **DEPUTY COMMISSIONER BENTLEY:**  okay, all

3  right.

4      **INMATE ALVE:**   -- what that is.

5      **DEPUTY COMMISSIONER BENTLEY:**  Your work

6  assignment since your last Hearing, you've

7  worked as a teacher's aid, and you get

8  exceptional work reports.  And you did receive a

9  laudatory chrono from T. Peppereck [phonetic].

10 It says that you've been a superior clerk as

11 long as -- that you've worked for him.  Is it a

12 him or a she?

13     **INMATE ALVE:**  She.

14     **DEPUTY COMMISSIONER BENTLEY:**  She.  "His

15 work habits are outstanding.  All tasks given to

16 him are done promptly without hesitation."  It

17 says that you are courtesy to staff and his

18 peers.  It says that "he's intelligent and takes

19 the initiative in completing projects that need

20 to be done."  And then he switched over and you

21 got into vocational eyewear?

22     **INMATE ALVE:**  Yes I did.

23     **DEPUTY COMMISSIONER BENTLEY:**  Okay.  And

24 you got from your vocational eyewear, Mr. Soceo

25 [phonetic].  He says that "you've been a student

26 and completing all aspects of the basic hands-on

27 training.  You've exhibited professionalism and

39

1  exceptional skills. He's detailed oriented,

2  creative and self-motivated. He is respectful

3  towards his supervisor as well as with his

4  students." So, obviously, you are very good

5  when you're working and in the vocational

6  programs. There was an issue and, I guess, at

7  your last Hearing that you expressed some

8  concerns about the high school diploma

9  situation. They indicated that they couldn't

10  find it?

11        **INMATE ALVE:** The Certificate for the

12  college.

13        **DEPUTY COMMISSIONER BENTLEY:** Okay. And

14  I just want to point out that I think where the

15  confusion came from, is that there's a strange

16  high school diploma in there that's got the

17  exact same typing on it, saying that you got

18  your high school diploma, as the next chrono

19  which states that you were on the honor roll at

20  Sacramento City College. And it's the exact

21  same typing.

22        **INMATE ALVE:** Well --

23        **DEPUTY COMMISSIONER BENTLEY:** Wait a

24  minute, don't interrupt me, Mr. Alve. We can't

25  both speak at the same time.

26        **INMATE ALVE:** (indiscernible).

27        **DEPUTY COMMISSIONER BENTLEY:** I have gone

40

1    back through your C-File and verified that you

2    did get your GED.  And I've also verified that

3    in 1981 you took several college courses.  So,

4    that's by going back and reviewing all the

5    chronos during that time period.

6              **INMATE ALVE:**  Uh huh.

7                   (Tape 1, Side A, ends)

8                   (Tape 1, Side B, starts)

9              **DEPUTY COMMISSIONER BENTLEY:**  Okay, this

10   is side two in the Subsequent Parole

11   Consideration Hearing for Alejandro Alve, CDC

12   Number B-77176.  And, let's see, I've indicated

13   -- oh, you've completed the vocational eyewear.

14             **INMATE ALVE:**  I (indiscernible).

15             **DEPUTY COMMISSIONER BENTLEY:**  Yeah.  And

16   so what, what are you skilled in?

17             **INMATE ALVE:**  Uh, well, all the skills

18   that I have acquired?

19             **DEPUTY COMMISSIONER BENTLEY:**  Uh huh.

20             **INMATE ALVE:**  Well, it's carpentry --

21             **INMATE ALVE:**  No, no, I meant in the

22   eyewear.

23             **INMATE ALVE:**  Oh, eyewear?  It's cutting

24   the glass to the prescription order.

25             **DEPUTY COMMISSIONER BENTLEY:**  Okay.

26             **INMATE ALVE:**  Uh huh.

27             **DEPUTY COMMISSIONER BENTLEY:**  All right,

41

1    now can you get Certified in that?

2        **INMATE ALVE:**  I can.  And you can get a

3    license, a State license, if completed the

4    additional courses that I require, which they

5    are available only at Donovan, I understand, to

6    become an optometrist.

7        **DEPUTY COMMISSIONER BENTLEY:**  Okay, all

8    right.  So, right now is your skill a marketable

9    skill?

10        **INMATE ALVE:**  Yes it is.  Also, well,

11    that's one of the marketable skills that I have

12    acquired throughout this 30 years of

13    imprisonment.

14        **DEPUTY COMMISSIONER BENTLEY:**  Okay.  I

15    didn't see any kind of things recent.  I think

16    way back in the early '90s there was some stuff

17    about any type of self-help that you're involved

18    in.

19        **INMATE ALVE:**  Of course.  Well, I work in

20    positions where I became foreman and teaching

21    the skills to other prisoners, and this mostly

22    on the factories (indiscernible) --

23        **DEPUTY COMMISSIONER BENTLEY:**  I'm taking

24    about alcohol and drug abuse programs.

25        **INMATE ALVE:**  Oh, alcohol and drug abuse.

26    I attended the AA.

27        **DEPUTY COMMISSIONER BENTLEY:**  In the

42

1    early '90s.

2         **INMATE ALVE:**  Uh, yes, but they have not

3    been recommended and one part from -- until I

4    reduce my custody, it wasn't available to me

5    because the meetings were conducted at

6    nighttime, outside of the building.  And so my

7    living conditions made it impossible for me to

8    attend --

9         **DEPUTY COMMISSIONER BENTLEY:**  Okay.  But

10   --

11        **INMATE ALVE:**   -- these meetings.

12        **DEPUTY COMMISSIONER BENTLEY:**  But what do

13   you mean it hasn't been recommended?

14        **INMATE ALVE:**  Well, over in Tehachapi in

15   the '90s, I believe I went through the a --

16   through these courses and received the

17   achievements.  And since then, until my custody

18   was reduced, I was unable to attend these

19   meetings.

20        **DEPUTY COMMISSIONER BENTLEY:**  Can you

21   attend now?

22        **INMATE ALVE:**  I can I suppose.

23        **DEPUTY COMMISSIONER BENTLEY:**  Okay.

24   Well, you know, you blamed a lot of this crime,

25   particularly the murder at the house that you

26   were burglarizing, you couldn't remember a lot

27   of it, it was fuzzy because you were so drunk

43

1    and high on drugs.

2        **INMATE ALVE:**  However, my, my record

3    indicates that I've been in remission from drugs

4    for the past 30 years.  And so, --

5        **DEPUTY COMMISSIONER BENTLEY:**  You have to

6    convince us that you're not going to use any on

7    the outside.  Mr. Alve, you kind of got this

8    attitude that you're going to do it your way.

9    And that's fine, you can ignore the

10    recommendations of the Board, but then we're

11    going to hold it against you at future Hearings.

12        **INMATE ALVE:**  But if I may, may I

13    address, with due respect, this Board?  For the

14    past 30 years, okay, I have been in remission

15    from drugs and alcohol.  And presently, even my

16    psychologist does not recommend any, any

17    programming --

18        **DEPUTY COMMISSIONER BENTLEY:**  Does the --

19    can the psychologist grant you parole?

20        **INMATE ALVE:**  Uh, no ma'am.

21        **DEPUTY COMMISSIONER BENTLEY:**  Okay.

22        **INMATE ALVE:**  However, I am hoping that

23    the decision will be based on the rules and the

24    law, and not on feelings, personal feelings.

25    What I'm stating, is simply this:  Throughout my

26    30 years of imprisonment, there hasn't been any

27    programs whatsoever available in the prison

44

1    system of this intoxication or in anyway to

2    assist in this rehabilitation.  I, with the help

3    of God, have determined, willing to stop.  And

4    for the past 30 years, I have not touched liquor

5    or drugs.  And it's not because of the absence

6    of drugs or alcohol in the prison system,

7    because the whole place is infested.  And so, my

8    willingness, and the assistance of God, and my

9    determination to be aware of everything that I

10   do in life, I have determined and have whole

11   responsibility on the part on my own life and

12   actions to do this.  For the past 30 years I

13   have not been in drugs nor liquor, not because

14   of absence of it, but because I am determined,

15   and with the help of God, of course, I stand

16   today, without smoking, drinking, or taking

17   drugs.

18        **DEPUTY COMMISSIONER BENTLEY:**  Okay, all

19   right.  I noticed that in 2000, I guess it was

20   about 2002, you sued the State for 2.3 million

21   dollars?

22        **INMATE ALVE:**  2.3 million dollars?

23        **DEPUTY COMMISSIONER BENTLEY:**  Uh huh.

24        **INMATE ALVE:**  It was in 2002?

25        **DEPUTY COMMISSIONER BENTLEY:**  Well, I

26   noticed that it was -- your suit was denied in

27   February of 2003, so, I figured it was probably

45

1  it was probably filed in 2002.

2         **INMATE ALVE:**  No.  The --

3         **DEPUTY COMMISSIONER BENTLEY:**  Maybe it

4  was before that.

5         **INMATE ALVE:**  The civil suit has to do

6  with the, with (indiscernible) violations and

7  retaliation from staff.  And the case is

8  currently still in Court.  And it has to do with

9  two 115s I received.

10        **DEPUTY COMMISSIONER BENTLEY:**  No, no, no,

11  that's not --

12        **INMATE ALVE:**  No?

13        **DEPUTY COMMISSIONER BENTLEY:**  This is a

14  different one.  No, this is one ---

15        **INMATE ALVE:**  Oh, yes.

16        **DEPUTY COMMISSIONER BENTLEY:**  You

17  remember that now.  You were asking for 2.3

18  million, because you weren't getting paid since

19  you've been incarcerated, you weren't receiving

20  minimum wage.

21        **INMATE ALVE:**  Uh huh.  That is correct.

22  I submitted a -- I challenged the Courts, okay.

23  The position of being in a -- of working, okay,

24  without being paid.

25        **DEPUTY COMMISSIONER BENTLEY:**  Uh huh.

26        **INMATE ALVE:**  Okay, the minimum wages --

27        **DEPUTY COMMISSIONER BENTLEY:**  Uh huh.

46

1        **INMATE ALVE:**  -- within the prison
2   system.

3        **DEPUTY COMMISSIONER BENTLEY:**  And do you
4   pay your room and board here?

5        **INMATE ALVE:**  Well, what is the relevancy
6   of this case, in regards to the suitability for
7   parole?  That will be my question.

8        **DEPUTY COMMISSIONER BENTLEY:**  Oh, I'm
9   just reviewing everything you've been doing.
10  This is you're post-conviction time.  Everything
11  you've been doing --

12       **INMATE ALVE:**  Of course.

13       **DEPUTY COMMISSIONER BENTLEY:**  -- since
14  your last Hearing.

15       **INMATE ALVE:**  But it has some post-
16  conviction conduct in relation to my conduct in
17  prison.  Now, as a citizen, although I am in
18  prison, I have a right under the law to
19  challenge some conditions that I consider they
20  are inappropriate.

21       **DEPUTY COMMISSIONER BENTLEY:**  Okay.

22       **INMATE ALVE:**  And to challenge it is not
23  a matter of being right or wrong, but it's a
24  matter for the Court to determine and make
25  determinations as to whether the Court decided -
26  -

27       **DEPUTY COMMISSIONER BENTLEY:**  Is that

1    still --

2         INMATE ALVE:   (indiscernible).

3         DEPUTY COMMISSIONER BENTLEY:   Is that

4    still on Appeal?

5         INMATE ALVE:   No, it is not.

6         DEPUTY COMMISSIONER BENTLEY:   And what

7    else do you do in your spare time?

8         INMATE ALVE:   Well, I study.

9         DEPUTY COMMISSIONER BENTLEY:   Uh huh.

10        INMATE ALVE:   Presently I'm studying

11   Chinese.  Okay, I also -- because I know several

12   languages, I'm available also and teach others,

13   like Chinese or Mexicans at the yard, I teach

14   these languages.  And since I have worked in

15   this prison, alone, approximately 12 years.

16   Nine years out of the 12 years, I worked as a

17   teacher's aid, first in the (indiscernible) and

18   then in junior high, VA-I, II.  And as a

19   consequence of this knowledge that I acquired,

20   from the teachers who had instructed me on how

21   to teach, I am able to give classes to Mexicans,

22   to Natives, and to presently Chinese.  In turn,

23   like (indiscernible), I'm being taught by a

24   Chinese in the language.

25        DEPUTY COMMISSIONER BENTLEY:   Okay, all

26   right.  Anything that I've overlooked that you

27   want to bring to our attention?

48

1         **INMATE ALVE:**  I think that in regards to

2    the post-conviction conduct, I think that it is

3    plainly reveled before you, okay, that

4    throughout a period of 30 years, there is

5    absolutely no violence, no drugs involvement, no

6    (indiscernible) involvement.  And, certainly, I

7    have dedicated all my time to studying, to

8    learn, and to acquire as many skills as I can on

9    the basics on training skills, in order to be

10   able -- viable enough to be able get employment

11   or to work on my own to make a living.

12        **DEPUTY COMMISSIONER BENTLEY:**  Okay, all

13   right.  Your psychological report was done by

14   Dr. Bellenger [phonetic], this was done in

15   August of this year.  And he goes through your

16   history that we've already discussed.

17        **INMATE ALVE:**  Uh huh.

18        **DEPUTY COMMISSIONER BENTLEY:**  And he

19   talks about the 115s and indicates that the writ

20   is an issue, that their not to be used, but

21   that's still has not been resolved.  And he

22   talks about your drug abuse, and reviews with

23   you the life crime.  And gives a poly substance

24   dependence, in remission, under Axis I; anti-

25   social personality disorder on Axis II; and he

26   has a good overall assessment of functioning.

27   He said that -- Mr. Alve, said that anyone could

49

1    be capable of doing something, because he was

2    drugged out he does not recall what happened,

3    but vowed to refrain from substance abuse

4    thereafter.  Apparently he has made good on that

5    later promise.  He is hopeful that the Board

6    will see that he has been responsible for his

7    actions in the past 30 years.  It is noted that

8    17 years ago that he made an escape attempt.  No

9    aggressive behavior has been sited since 1993.

10   However, some passive-aggressiveness is

11   indicated by the more recent 115s.  In 2000, he

12   refused to submit thumb or palm print.  Then he

13   talks about the two more recent ones.  And, "if

14   released to the community under supervision of

15   his family, his level of dangerousness would be

16   far below that of the average Level IV inmate.

17   He might become a high risk for acting out if

18   encountering frustrations in the transitions,

19   such a termination of family support, inability

20   to find employment, or resumption of alcohol

21   abuse.  The later would certainly put his

22   potential for violence at an above-average

23   level.  And it is recommended, if he were

24   required to attended AA meetings, that he at

25   least be monitored -- if he were not required to

26   attend AA meetings, he monitored through

27   intervention at Parole Outpatient Testing."  So

50

1    the doctor had some concerns about that.  So,

2    with that I'll return to the Chair.

3         PRESIDING COMMISSIONER SAWYER:  Okay,

4    thank you.  Mr. Sachs, do you have any

5    questions?

6         DEPUTY COMMISSIONER BENTLEY:  I did.

7         PRESIDING COMMISSIONER SAWYER:  Oh.

8         DEPUTY COMMISSIONER BENTLEY:  I have some

9    questions that went back to the police --

10        PRESIDING COMMISSIONER SAWYER:  Okay.

11        DEPUTY DISTRICT ATTORNEY SACHS:  Yes, --

12        DEPUTY COMMISSIONER BENTLEY:  Wait a

13   minute.  I was going to address that Police

14   letter.  That apparently the Police Department

15   was confused, because Mr. Bemer --

16        PRESIDING COMMISSIONER SAWYER:  Uh huh.

17        DEPUTY COMMISSIONER BENTLEY:  Well, he

18   was killed in Balboa Park the night that

19   Mr. Dores was killed, and shot with the same gun

20   that Mr. Dores was killed with.

21        PRESIDING COMMISSIONER SAWYER:  Same

22   caliber.

23        DEPUTY COMMISSIONER BENTLEY:  Same -- but

24   there was no conviction.

25        PRESIDING COMMISSIONER SAWYER:  Right.

26        DEPUTY COMMISSIONER BENTLEY:  They had

27   just gotten that confused with the victim

1  Howard.  Okay.  That was all I had.

2        PRESIDING COMMISSIONER SAWYER:  Okay,

3  thank you.  Okay, Mr. Sachs, do you have any

4  questions.

5        DEPUTY DISTRICT ATTORNEY SACHS:  Yes.

6  Could you ask the inmate what part homosexual

7  sex played in the murders.

8        ATTORNEY SHARRIEFF:  He will not be

9  discussing the life-crime at all.

10        PRESIDING COMMISSIONER SAWYER:  Okay.  He

11  will not be discussing the life-crime at all.

12        DEPUTY DISTRICT ATTORNEY SACHS:  Very

13  well.  I have no other questions.

14        PRESIDING COMMISSIONER SAWYER:  Okay.  Do

15  you have any question?

16        ATTORNEY SHARRIEFF:  No questions.

17        PRESIDING COMMISSIONER SAWYER:

18  Mr. Sachs.

19        DEPUTY DISTRICT ATTORNEY SACHS:  On

20  behalf the People of the State of California, we

21  would respectfully oppose parole.  We feel that

22  release of this inmate would pose an extreme and

23  unreasonable risk of danger to society.  These

24  were sex crimes.  Basically, this man has

25  unresolved issues about his own sexuality.  And

26  whether he's into homosexual sex with these men,

27  the pictures clearly show that the victims were

52

1  nude, one of them had been sexually assaulted in

2  the genital.  It's obvious that this man has

3  unresolved homosexual issues and would become an

4  extreme risk.  That he has done nothing to

5  address it; he's in complete denial.  He claims

6  he has no such issue, but the truth is that he

7  does.  A review of his file shows that he is

8  serving a life sentence for killing two

9  individuals, and one of them was working at a

10  gay bar as a bartender, and as the man was

11  cleaning up the bar, basically, he was ordered

12  to hand over money from the safe and the cash

13  drawers.  This inmate then demanded that the

14  victim, Mr. Dores, fix him and a drink, and he

15  told Mr. Dores and Mr. Stephens that he had

16  killed people before and he would do it again.

17  He told them he had to kill them because he

18  would not leave a witness, as he was before.  It

19  was this inmate that inquired and asked as to

20  whether they were homosexuals, and told them

21  several times:  "I'm a professional, I'm for

22  real."  Mr. Alve took their jewelry and order

23  these men to undress.  He then forced Mr. Dores

24  to orally copulate him, and forced Mr. Stephens

25  in the closet.  While in the closet, Stephen

26  heard a commotion and a gunshot.  Alve then

27  released him from the closet and order him to

1   turn on the bar lights and get him a beer.

2   After the second beer, Alve locked Stephens in

3   the closet again, and Stephens heard another

4   gunshot.  He waited for a while in the closet

5   and then finally escaped to call the Police.

6   Dores' body was found on the floor, near the

7   bar, with a knife embedded to hits hilt in his

8   abdomen.  He was shot twice in the head, stabbed

9   in the neck and abdomen, and his genitalia were

10  sliced five times, indicating that this inmate

11  has unresolved homosexual issues with this

12  victim.  There was a murder -- the second murder

13  that occurred that the Board covered, and it

14  basically involved similar type violence and

15  homosexual overtones as there was in this case.

16  Based on totality of the circumstances, the

17  inmate's complete lack of insight into the

18  crime, the causative factors of the crime, and

19  his own sexual identity issues that have caused

20  him to act out violently in the past, we would

21  submit under the (indiscernible),

22  (indiscernible), and *Dandenberg* [phonetic]

23  decisions, that should be denied.

24          **PRESIDING COMMISSIONER SAWYER:**  Thank

25  you.  Mr. Sharrieff.

26          **ATTORNEY SHARRIEFF:**  Thank you,

27  Commissioner.  I do believe that Mr. Alve should

54

1  be found suitable for parole.  I understand that

2  the murders were serious and horrible.  However,

3  looking truly at the totality of the

4  circumstances, and in particular, Mr. Alve's

5  performance while at CDC, he was convicted to

6  seven years to life, with parole.  And, if we

7  look at the crime, and also in comparison to the

8  inmate, I do believe that the Central File, over

9  a period of 30 years, we can state that there

10  has been no prison gang involvement, no drug and

11  alcohol involvement, and no violence whatsoever.

12  His work performance has been excellent to

13  exceptional.  He has numerous laudatory chronos

14  that indicate that he's detailed oriented,

15  responsible, professional, and a workhorse.  And

16  for the most part, if you look at the emphasis,

17  it's mostly on his perfect attendance.  At the

18  last full Hearing that Mr. Alve had, he was told

19  and was recommended that he upgrade

20  academically; and he has done so.  He actually

21  was in the Honor Program.  He is currently, as

22  we speak, he's a straight A student.  He has

23  received his GED Certificate, high school

24  diploma, and he has some college work.  As far

25  as the languages that he speaks, he came in

26  knowing little English, now he's fluent in

27  English, he knows Hebrew, German, and Chinese.

55

1   And he also upgraded as far as vocationally, in

2   eyewear, that he can also use as a marketable

3   skill.  He has additional marketable skills in

4   carpentry, upoultry [phonetic], upholstery,

5   excuse me, cutting confection, tailoring, and

6   optical technology skills.  From 2001 and 2003,

7   if we look at his laudatory chronos, he has also

8   been exceptional, punctual and professional.  He

9   has strong family ties.  His family has

10  indicated, from the letters that were submitted

11  to the Board for this Hearing, include letters

12  from family members who were born after

13  Mr. Alve's incarceration and who are now adults,

14  they are Daniel, Corina, and Armando [phonetic],

15  they are all willing to support Mr. Alve.  If

16  you look at his criminal history, he has one

17  Federal case, which was smuggling of an alien.

18  If you look at the psych recommendation, there

19  was some concern about his alcohol use in the

20  past, and it was stated that it's in remission.

21  I do believe that Mr. Alve should continue to

22  stay in AA; however, 30 years being clean and

23  sober, no write-ups, it's a clear indication

24  that he has made up his mind not to go back to

25  the life of using drugs or alcohol.  But I do

26  believe that in order to show the Board, he has

27  to stay in NA and AA, because he's going to need

56

1  that support on the outside.  The crime is a

2  serious crime.  It will always be a serious

3  crime.  The only thing that will change will be

4  Mr. Alve.  And in over 30 years, looking at his

5  C-File, we can honestly say that he has changed.

6  I do believe that we can all agree that he's an

7  intelligent man.  That he used his time in

8  matters that we sometimes may be opposed of, but

9  that is his right to file lawsuits, if he feels

10  it is justified.  However, he has to understand,

11  as far as programming, he has to do what the

12  Board wants him to do and not his own program.

13  Any recommendation by the Board in the past, I

14  believe, Mr. Alve will continue meet those

15  recommendations.  But as today's date and this

16  morning, he should be found suitable for parole.

17  And I'll submit.

18       **PRESIDING COMMISSIONER SAWYER:**  Thank

19  you.  Mr. Alve, this is your opportunity to tell

20  us why you feel that you are suitable for

21  parole.

22       **INMATE ALVE:**  Well, as my attorney

23  indicated, as the evidence that is before you in

24  my Central File and my post-conviction conduct

25  and the objective of the ISL Statute on which I

26  was convicted to seven years to life, with

27  parole, I was sentenced -- because there must be

1    a meaning of the sentence seven years to life,

2    with parole, I believe that there must be a

3    meaning, a limit, there must be a set limit in

4    which life ends and parole begins.  If life

5    means until death and parole to go out of prison

6    in a coffin, what purpose would it be in my

7    appearing before this Committee, complying with

8    ever, ever recommendation made by the Parole

9    Board, and myself, exerting all my efforts to

10   change my life, to learn skills that be able to

11   give me a chance in life.  After this 30 years,

12   my record speaks for itself, like my counselor

13   has stated, of my positive thinking, my

14   willingness to become something, to give to

15   society, and to be with my family.  So, my

16   question, my question after 30 years of

17   imprisonment, in the mitts of the violence, the

18   drugs, is when does -- what is the limit of

19   life, and when does parole begin?  I was

20   sentenced to seven years to life, with parole.

21   The word parole, with parole, this preposition

22   of phrase indicates that there must be an

23   opportunity if complying with the rules set

24   forth by the BPT.  Every rule that the BPT has

25   set forth, I have complied with.  Not because I

26   have asked to, but because of my own

27   willingness, because of my own determination to,

58

1   to, to be with my family, to give something back

2   to society upon my release.  So, that is the

3   only thing that I can say that if I was

4   sentenced to seven years to life, I have

5   complied with everything, not because I've been

6   asked, but because that is my determination,

7   because that is what I am.  If in the past --

8   okay, I had been under LSD, drugs and

9   everything, unfortunately, through my youthhood,

10  everything started at Lompoc when I got in that

11  prison; I was introduced to drugs.  I came out

12  of Lompoc being an addict.  I continued my life

13  of being an addict and, unfortunately, I ended

14  up in prison.  But throughout this 30 years,

15  understanding my -- the situation of this type

16  of life that I was living, under the drugs, and

17  aware of what was surrounding me, I determined

18  that I, that I have to be responsible for my

19  actions, that I have to be aware.  And although

20  in the mitts of a violent environment, where no

21  (indiscernible) is used to settled matters, but

22  slashes and killings and stabbings is the

23  Cardinal rule to settle matters.  Where clicks

24  are the thing to go into, and drugs, to forget

25  what life is about, for the past 30 years, I

26  have dedicated my life and every minute that I

27  have had, educating myself and acquiring skills

59

1    so that I could be able to confront freedom and

2    be able to be a citizen and to be able to

3    sustain my stay with my family.  And I can, I

4    can only say that I, personally, as the record

5    indicates, in order to show my innocents, I went

6    through hypnotism, lie detectors, pentathol

7    injected for seven years, and even signing a

8    paper risking my own mental facilities, in order

9    to so that they could put the pentathol for me,

10   so I would know whether I had done these

11   terrible things while under the drugs.  And

12   although the studies of the psychologist states

13   that, that I was so drugged up, perhaps, that I

14   don't even know whether these things happened.

15   What I do know now, is that these things, or any

16   behavior, will never happen, because I will

17   never again, as I have stated and the record

18   shows, be in any way involved in drugs, consume

19   drugs, liquor, not even cigarettes.  And that

20   has been my life in prison, in the mitts of

21   rapes, violence, drugs, I have dedicated myself

22   the time to learn, acquire skills and teach

23   others, hopefully, these things that I have

24   learned, in order for them to be able to acquire

25   their freedom and to become persons.  And beyond

26   that I have nothing else to add.

27            **PRESIDING COMMISSIONER SAWYER:**  Okay.

60

1   The time is ten minutes after ten.  And we will

2   recess for deliberations.

3                         **R E C E S S**

4                         --oOo--

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

61

| | |
|---|---|
| 1 | **CALIFORNIA BOARD OF PAROLE HEARINGS** |
| 2 | **D E C I S I O N** |
| 3 | **DEPUTY COMMISSIONER BENTLEY:**   Okay, we're |
| 4 | back on record. |
| 5 | **PRESIDING COMMISSIONER SAWYER:**   The time |
| 6 | is 10:25.   In the matter of Mr. Alve.   The Panel |
| 7 | has reviewed all the information received from |
| 8 | the Public and relied on the following |
| 9 | circumstances in concluded that the prisoner is |
| 10 | not suitable for parole and would pose an |
| 11 | unreasonable risk and danger to society or a |
| 12 | threat to public safety if released from prison. |
| 13 | First of all, the commitment offense was -- |
| 14 | commitment offenses were especially cruel and |
| 15 | callous.   On the night of October 3, 1975, |
| 16 | Mr. Dores worked as a bartender at the Swing |
| 17 | Bar, his friend, David Stephens, stayed behind |
| 18 | to help him clean the bar and give him a ride |
| 19 | home.   As they were about the leave through the |
| 20 | backdoor, a man holding a gun, identified as |
| 21 | Mr. Alve, demanded money, returned inside and |
| 22 | Mr. Dores handed over money from the safe and |
| 23 | cash drawers.   Alve then demanded that Mr. Dores |
| 24 | fix him a drink.   He told Mr. Dores and |
| 25 | Mr. Stephens that he had killed people before |
| 26 | and would do it again.   He told them that he had |
| 27 | **ALEJANDRO ALVE      B-77176   DECISION PAGE 1    11/16/05** |

62

1    to kill them because he would not leave

2    witnesses as he had before.  He asked them if

3    they were homosexuals.  He told them several

4    times that he's a professional and he was for

5    real.  Alve took their jewelry and ordered them

6    to undress.  He forced Mr. Dores to orally

7    copulate him.  He forced Mr. Stephens into a

8    closet.  While in the closet, Mr. Stephens heard

9    a commotion and a gunshot.  Alve [sic] was

10   released from the closet and ordered to turn on

11   the bar lights and get him a beer.  After the

12   second beer, Alve locked Mr. Stephens into the

13   closet again.  Mr. Stephens then heard another

14   gunshot.  He waited for a while in the closet,

15   and then finally escaped to call the Police.

16   Mr. Dores' body was found on the floor near the

17   bar, with a knife embedded up to its hilt in his

18   abdomen.  The autopsy revealed that he was shot

19   twice in the head, stabbed in the neck and

20   abdomen, and his genitalia had been sliced five

21   times.  On November 11th, Mr. Stephens

22   identified Alve as the murderer during a live

23   lineup.  Prior to this an additional assault --

24   prior to this an additional assault and murder

25   took place.  This commitment offense, clearly,

26   was calculated, dispassionate.  It was

27   **ALEJANDRO ALVE      B-77176   DECISION PAGE 2    11/16/05**

63

1   inexplicable in terms of a motive.  It was just

2   for robbery but he carried it way beyond, way

3   beyond a robbery.  Mr. Alve has no juvenile

4   history, as far as violence is concerned.  He

5   does have in 1965 the L.A. Sheriff's Department,

6   for theft, he was fined and served 16 days in

7   jail; he was arrested by San Diego for driving

8   while intoxicated, no driver's license; he was

9   also arrested by the Federal authorities for

10  transporting illegal aliens, he was released on

11  a citation and O.R., and did a year at Lompoc,

12  sentenced to one year at Lompoc, and was paroled

13  to a halfway house in Los Angeles.  So he had a,

14  he certainly had an escalating pattern of

15  criminal conduct or violence.  He has a history

16  of tumultuous, unstable relationships.  He

17  failed to profit from society's attempt to

18  correct his criminality, with the Federal and

19  County commitments.  Institutional behavior,

20  he's had eighteen 115s, the last two in '02 for

21  failure to obey orders, and report to work.  And

22  it's only fair to indicate that he has appealed

23  both and received a favorable appeal, but the

24  institution is appealing it as well.  He's had

25  four 128s, the last one in '03, refusing to

26  work.  He has achieved his GED while in custody.

27  **ALEJANDRO ALVE      B-77176   DECISION PAGE 3    11/16/05**

64

1  He's taken some classes from Sacramento College,

2  University.  He did attend AA in the 1990s.

3  He's received some laudatory chronos from his

4  work.  It appears that he does like to work.  He

5  is working as a clerk, teacher's assistant,

6  vocational eyewear.  He has worked as a

7  carpenter, upholster, tailor, and he's completed

8  his eyewear in 3/03.  We do have on file a high

9  school diploma, in 1980, and as I mentioned

10  college in '81.  He was asked by the Board to

11  participate in self-help programs at his last

12  Hearing, and there is no indication of any self-

13  help, other than, as he's testified today, his

14  language skills, his teaching internally, and

15  learning Chinese?

16      INMATE ALVE:  Yes.

17      PRESIDING COMMISSIONER SAWYER:  I think

18  the Board has, as this Board is going to,

19  recommend a more structured self-help, a more

20  focused self-help, particularly in areas that

21  would be beneficial in his future.  Psychiatric

22  factors, under Assessment of Dangerousness:  "If

23  released to the community under supervision of

24  his family, his level of dangerousness would be

25  far below that of an average Level IV inmate.

26  He might become a high risk for acting out if

27  **ALEJANDRO ALVE     B-77176   DECISION PAGE 4    11/16/05**

65

1    encountering frustrations in the transitions,

2    such as, termination of family support,

3    inability to find employment, or resumption of

4    alcohol abuse.  The later would certainly put

5    his potential for violence at an above average

6    level.  Even though he has sat here and said

7    that he's in remission, he needs some safeguards

8    in that particular area at this time.  No mental

9    health recommendations are made.  Mr. Alve, to

10   his credit, seems to have done everything he

11   could do to demonstrate his ability to prepare

12   himself for release.  He has not seen the need

13   of alcohol or drug treatment; however, it is

14   recommended that if he were not required to

15   attend AA, NA meetings, that he at least be

16   monitored through intervention at a Parole

17   Outpatient setting."  His parole plans, he had

18   some letters from his sisters, offering support.

19   It appears that you do have good support, family

20   support: your nieces, your nephews, and your

21   sisters out there.  You do have some marketable

22   skills, particularly, you are working on this

23   eyewear and you're getting average to above

24   average work reports on the eyewear program.

25   When will that be complete, sir?

26        **INMATE ALVE:**  The program here goes only

27   **ALEJANDRO ALVE   B-77176   DECISION PAGE 5   11/16/05**

66

1  to that level.  The level that precedes this

2  level is given at Donovan.  So, it's not

3  available here.  I completed what it was

4  available.

5      **PRESIDING COMMISSIONER SAWYER:**  Okay.

6  Well, keep working on that and maybe you can get

7  some State Certification towards that.  That

8  would be a real positive step, wouldn't it?

9  State Certification.

10     **INMATE ALVE:**  It would.  If only it was

11  in my power to transfer myself to Donovan.

12     **PRESIDING COMMISSIONER SAWYER:**  Okay.

13  The 3042 Responses, from Mr. Sachs, San Diego

14  County, and a letter from the City of San Diego,

15  both opposing parole.  You should be commended,

16  sir, for you work efforts in the area of

17  carpentry, upholstery, tailor, in the past.

18  Currently, your eyewear, you're working as a

19  teacher's assistant, as well as you talked --

20  you told us about some ESL that you're doing for

21  other inmates.  The past, way back, for

22  Sacrament, University of Sacramento, and your

23  GED, and you're AA in the early '90s.  You've

24  received good chronos from some of these places

25  that you've work.  However, these positive

26  aspects of your behavior does not outweigh the

27  **ALEJANDRO ALVE    B-77176   DECISION PAGE 6   11/16/05**

67

1   factors of unsuitability, being the commitment
2   offense, the commitment offense, I'll call it
3   Number One, and commitment offense Number Two,
4   which is the murder of J.R. Howard and the
5   assault of Emma Howard.  This would be a
6   multiple year denial.  In a separate decision,
7   we find that "On the evening November 8, 1975,
8   Emma Howard was awakened by the downstairs light
9   being turned on, the hallway light to her
10  bedroom went on, and a man entered her doorway.
11  She screamed at him, get out of here.  She
12  followed him down the hallway to the living
13  room, he threw her across the couch onto a
14  coffee table and told her, as he brandished a
15  knife, I kill people, rob them and kill them,
16  they come back to earth and work for me.  He
17  choked her and stuffed a rag in her mouth.  He
18  demanded her money, jewelry and ransacked the
19  house.  She managed to escape out the front door
20  and telephoned Police from a neighbor's house.
21  When the Police Officer arrived, Alve came to
22  the door, carrying clothes on a hanger.  The
23  Officer drew his revolver and order him to stop.
24  He slammed the door shut and went out of the
25  back window and escaped into a canyon, where he
26  was found a couple hours later.  Mrs. Howard
27  **ALEJANDRO ALVE    B-77176  DECISION PAGE 7    11/16/05**

68

1    immediately identified Alve as her assailant, in

2    a curbside lineup.  The body of her son,

3    J.R. Howard, was discovered in his bedroom

4    downstairs, with a stab wound piercing his

5    heart."  This, again, is a particularly cold and

6    callous.  It was in the commission of burglary

7    as well, and certainly, premeditated, and

8    resulted in the death of one man and the injury

9    of an 83-old woman, at the time.  We are going

10   to recommend, sir, that you, again, as previous

11   Panels have recommended, that you get self-help,

12   and specifically in the AA, NA area, given the

13   fact that alcohol and drug abuse were factors in

14   this commitment offense.  And even though you

15   say you're in remission, the psychologist report

16   -- and as we all know, when we're faced with

17   life, we look to, sometimes, we look to

18   chemicals to reduce that stress level.  And we

19   all know that it's not, it's not sufficient, but

20   it's something that this Board wants you to do,

21   is to get you some self-help.  It doesn't

22   necessarily have to be AA, but AA has got some

23   structure.  AA has got some tentacles outside,

24   so that you can go to San Diego and you can

25   continue on with the program, just like -- if

26   you decide to do this, you don't have to if you

27   **ALEJANDRO ALVE     B-77176   DECISION PAGE 8     11/16/05**

69

1  don't want to, but we recommend it, strongly

2  recommend it.  Stay disciplinary free, earn

3  those positive chronos, no more 115s or 128s.

4  Commissioner Bentley?

5      **DEPUTY COMMISSIONER BENTLEY:**  Yeah.  I

6  just wanted to point out to Mr. Alve that we

7  gave you a break today.  Because we decided that

8  we were not going to use, as a reason to deny

9  parole, the 115s.  If we had so chosen it might

10  have been additional time; but we did not, we

11  didn't use them.  And we gave you the break on

12  that to let you go through the Appeal's process.

13      **PRESIDING COMMISSIONER SAWYER:**  And we're

14  denying your parole for three years, sir.

15      **INMATE ALVE:**  That's (indiscernible).  I

16  did submit a question to the Board, and the

17  question was never answered.  And the question

18  was:  What is the set limit when life-term ends

19  in order for parole to begin?  Because, being

20  that the crimes, because they are in the past

21  and by virtue of being in the past cannot change

22  --

23      **PRESIDING COMMISSIONER SAWYER:**  Well --

24      **INMATE ALVE:**  I am the person who can

25  change.  So, being denied parole on the basis on

26  the underlying conviction, is a thing of which I

27  **ALEJANDRO ALVE    B-77176    DECISION PAGE 9    11/16/05**

70

1  cannot possible change on my own.

2      DEPUTY COMMISSIONER BENTLEY:  I suggest

3  you read the *In re Dandenberg* decision, and that

4  will answer your question.

5      INMATE ALVE:  Uh, there is nothing -- the

6  question --

7      DEPUTY COMMISSIONER BENTLEY:  You're

8  maximum term is life, Mr. Alve.

9      INMATE ALVE:  It says, seven years to

10  life, with parole.  The preposition phrase with

11  parole creates a liberty (indiscernible) --

12      DEPUTY COMMISSIONER BENTLEY:  It's with

13  the possibility of parole.

14      INMATE ALVE:  With possibility of parole,

15  based on the post-conduct, okay, and

16  consideration is also taken, of course, on the

17  post -- on the history, criminal history.  I

18  have, as you noted, sir, no criminal history,

19  whatsoever.  No youth or adult violent history.

20  As for --

21      PRESIDING COMMISSIONER SAWYER:  You --

22      INMATE ALVE:  As for--

23      PRESIDING COMMISSIONER SAWYER:  You do

24  have a (indiscernible).

25      INMATE ALVE:  As for the theft of car, it

26  was also a mistake.  The charge was dropped and

27  **ALEJANDRO ALVE    B-77176   DECISION PAGE 10    11/16/05**

.71

1    there is no record that I had ever been

2    convicted of a theft of a car.   The charges were

3    dropped and I was remained in jail as a result

4    of my ticket for drunk driving.   But there is no

5    conviction of a theft.

6            **PRESIDING COMMISSIONER SAWYER:**   Okay.   I

7    didn't say conviction; I said arrest.

8            **INMATE ALVE:**   So that –

9            **PRESIDING COMMISSIONER SAWYER:**   You're

10   time in jail.

11           **INMATE ALVE:**   But that was for the drunk

12   driving.   So ––

13           **DEPUTY COMMISSIONER BENTLEY:**   It seems to

14   me that this Hearing is concluded.

15           **PRESIDING COMMISSIONER SAWYER:**   Well, I

16   just want ––

17           **INMATE ALVE:**   Without ––

18           **PRESIDING COMMISSIONER SAWYER:**   –– I just

19   want to (indiscernible).

20           **INMATE ALVE:**   without answering the

21   question, of which I have a right to know.

22           **PRESIDING COMMISSIONER SAWYER:**   We just –

23   – I believe we answered your question.

24           **DEPUTY COMMISSIONER BENTLEY:**   Yeah, your

25   sentence is seven to life with a possibility of

26   parole.

27   **ALEJANDRO ALVE     B-77176   DECISION PAGE 11   11/16/05**

72

1        **INMATE ALVE:**  And that --

2        **DEPUTY COMMISSIONER BENTLEY:**  You're

3    maximum term can be life.

4        **INMATE ALVE:**  But the possibility for

5    parole, on what, on what factors is it based?

6    Is it not on post-conviction conduct?

7        **DEPUTY COMMISSIONER BENTLEY:**  It's based

8    -- the primary factor in determining parole

9    suitability, and you know the Penal Code, is the

10   main thing that we take into consideration is

11   the commitment offense.

12       **INMATE ALVE:**  The underlying -- so, I am

13   being denied for the underlying conviction.

14       **DEPUTY COMMISSIONER BENTLEY:**  That's one

15   of the reasons, and then your failure to follow

16   the recommendations of the Board.

17       **INMATE ALVE:**  I did so.

18       **PRESIDING COMMISSIONER SAWYER:**  Okay.

19   This Hearing is concluded.  Thank you very much,

20   good luck to you sir.  The time is 10:42.

21            --oOo--

22

23   **PAROLE DENIED THREE YEARS**          MAR 1 5 2006

24   **THIS DECISION WILL BE FINAL ON:**_____

25   **YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT**

26   **DATE, THE DECISION IS MODIFIED.**

27   **ALEJANDRO ALVE   B-77176   DECISION PAGE 12    11/16/05**

73

## CERTIFICATE AND
## DECLARATION OF TRANSCRIBER

I, JUDY K. FARNCOMB, a duly designated
transcriber, PETERS SHORTHAND REPORTING, do hereby
declare and certify under penalty of perjury that I
have transcribed tape(s) which total One in number and
cover a total of pages numbered 1 - 72, and which
recording was duly recorded at CALIPATRIA STATE
PRISON, CALIPATRIA, CALIFORNIA, in the matter of the
SUBSEQUENT PAROLE CONSIDERATION HEARING OF ALEJANDRO
ALVE, CDC NO. B-77176, on NOVEMBER 16, 2005, and that
the foregoing pages constitute a true, complete, and
accurate transcription of the aforementioned tape to
the best of my ability.

I hereby certify that I am a disinterested
party in the above-mentioned matter and have no
interest in the outcome of the hearing.

Dated December 9, 2005, at Sacramento,
California.

JUDY K. FARNCOMB
TRANSCRIBER
**PETERS SHORTHAND REPORTING**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

ALEJANDRO ALVE

                                                    Case No.

                              Petitioner,

V.

                                                    PROOF OF SERVICE

L.E. SCRIBNER, WARDEN

                              Respondent.

_____/

   I the undersigned hereby certify that I am over the age of eighteen years, and am a party to the above-entitled Action.

   On ___1/23/08___, I served a copy of:

                    PETITION FOR WRIT OF HABEAS CORPUS

By placing said copy in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the United States Mail:

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
880 FRONT STREET, SUITE 4290
SAN DIEGO, CA., 92101-8900

   I declare under penalty of perjury that the foregoing is true and correct.

Dated:___1/23/08___

                              ALEJANDRO ALVE

JS44
(Rev. 07/89)

## CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974 is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE SECOND PAGE OF THIS FORM.)

**I (a) PLAINTIFFS**

**Alejandro Alve**

2254   1983

FILING FEE PAID
Yes☐   No☐

IFP MOTION FILED
Yes☐   No☐

COPIES SENT TO
Court☐   Pro Se☐

L. E. Scribner

**FILED**
JAN 2 5 2008

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF** Imperial
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**

Alejandro Alve
PO Box 5002
Calipatria, CA 92233
B-77176

ATTORNEYS (IF KNOWN)

**'08 CV 0162 W LSP**

**II. BASIS OF JURISDICTION (PLACE AN x IN ONE BOX ONLY)**

☐ 1 U.S. Government Plaintiff

☒ 3 Federal Question
(U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4 Diversity (Indicate Citizenship of Parties in Item III

**III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN X IN ONE BOX
(For Diversity Cases Only)           FOR PLAINTIFF AND ONE BOX FOR DEFENDANT**

|  | PT | DEF |  | PT | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐1 | ☐1 | Incorporated or Principal Place of Business in This State | ☒4 | ☐4 |
| Citizen of Another State | ☐2 | ☐2 | Incorporated and Principal Place of Business in Another State | ☐5 | ☐5 |
| Citizen or Subject of a Foreign Country | ☐3 | ☐3 | Foreign Nation | ☐6 | ☐6 |

**IV. CAUSE OF ACTION (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY).**

### 28 U.S.C. 2254

**V. NATURE OF SUIT (PLACE AN X IN ONE BOX ONLY)**

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reappointment |
| ☐ Marine | ☐ 310 Airplane | ☐ 362 Personal Injury-Medical Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | ☐ 630 Liquor Laws | ☐ 820 Copyrights | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment &Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 RR & Truck | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 153Recovery of Overpayment of Veterans Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities Exchange |
| ☐ 160 Stockholders Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC |
| ☐ Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 864 SSID Title XVI | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | ☒ 530 General | ☐ 791 Empl. Ret. Inc. | ☐ 871 IRS - Third Party 26 USC 7609 | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Tort to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ Security Act | | |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | | ☐ 950 Constitutionality of State |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | ☐ 890 Other Statutory Actions |

**VI. ORIGIN (PLACE AN X IN ONE BOX ONLY)**

☒ 1 Original Proceeding ☐ 2 Removal from State Court ☐ 3 Remanded from Appellate Court ☐ 4 Reinstated or Reopened ☐ 5 Transferred from another district (specify) ☐ 6 Multidistrict Litigation ☐ 7 Appeal to District Judge from Magistrate Judgment

**VII. REQUESTED IN COMPLAINT:** ☐ CHECK IF THIS IS A CLASS ACTION UNDER f.r.c.p. 23

DEMAND $

Check YES only if demanded in complaint:
**JURY DEMAND:** ☐ YES ☐ NO

**VIII. RELATED CASE(S) IF ANY (See Instructions):** JUDGE _____ Docket Number _____

DATE   1/25/2008

SIGNATURE OF ATTORNEY OF RECORD

_R. Miller_


CR